**CAUCUS DISTRIBUTORS, INC., et al., Relators,**

v.

**COMMISSIONER OF COMMERCE, Respondent.**

No. C4–87–1952.

Court of Appeals of Minnesota.

April 5, 1988.

Review Denied June 10, 1988.

Stuart L. Finney, Fuller & Finney, Edina, Patrick J. Moran, Moran & Pilger, Houston, Tex., for relators.

Hubert H. Humphrey, III, Atty. Gen., Jerome L. Getz, Sp. Asst. Atty. Gen., St. Paul, for respondent.

Heard, considered and decided by RANDALL, P.J., and LANSING and MULALLY,* JJ.

## OPINION

RANDALL, Judge.

This matter is before us on writ for certiorari to review a decision of the Commissioner of Commerce. The Commissioner found promissory notes relators offered and sold in exchange for loans were unlicensed securities. The Commissioner ordered relators to cease offering or selling unfiled promissory notes or debt instruments without obtaining an opinion letter from the department of commerce. This appeal is from the Commissioner's order. We affirm.

## FACTS

Relators Caucus Distributors, Inc. (CDI) and Campaigner Publications, Inc. (CPI) are New York corporations. Independent Democrats for LaRouche (IDL) is an unincorporated association.

MM, an 85 year old widow, was the only witness to testify at the hearing. According to MM's testimony, her first contact

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

with respondents was in July 1984. MM was downtown Minneapolis, when she saw an individual passing out pamphlets. MM took a pamphlet and found it discussed Lyndon LaRouche. She heard LaRouche on television a few days earlier, and she told the pamphleteer she liked LaRouche and his views. MM gave the pamphleteer her telephone number so someone could call her and talk about LaRouche.

About a week later, MM received a telephone call from Ron Fredman of the Chicago office. Fredman told MM that the organization could use her help in its efforts to cut down on dope pushing in the Middle East and other places. He also mentioned incidents of banks closing, a matter of which MM was already aware through various newspaper articles.

Fredman asked MM to loan money to the LaRouche organization. MM testified Fredman told her she would get a promissory note, specifying the interest rate and maturity date, and MM said she "thought it was just like something you would give to a bank." In return for a $15,000 three-year loan, MM received two notes, one for $10,000 and another for $5,000.[1] On September 3, 1984, MM made out a check for $1000, payable to IDL. On the bottom of the check, MM made the notation: "1–yr. loan at 10%."[2] Shortly after MM mailed the check, she received a note from IDL, signed by Paul Greenberg. Relators stipulate that this was a valid loan, and that Greenberg was authorized to sign the note.

After receiving another telephone call from Fredman, MM made out a check to CDI for $5000. On the bottom of the check, MM wrote: "90–day loan, 15 percent annual rate." MM received a note from CDI in early 1985, after Fredman informed her she could not be repaid within the 90–day period.

About November 26, 1984, MM made another loan to CDI for $10,000, "for the same reason that [she] made the other ones. [She] thought it was a good invest-

ment * * *." MM received a six-month promissory note dated November 26, 1984, signed by Fredman for CDI in the amount of $10,000, with interest at 16%. Fredman offered her 16% when she told him she had a certificate of deposit (CD) at 14%.

In April 1985, Mr. Fredman called MM and asked to borrow more money from her. MM sent CDI one check for $4000 and another for $6000. She received a $10,000 promissory note at 10% interest from CDI, signed by Fredman. In the fall of 1985, appellant received three checks from CDI, totalling $1000, as partial loan repayment.

MM testified she never believed she would not be timely repaid on the notes. She testified she was not informed that CDI was borrowing significant amounts of money from other persons. She did not know that CDI, CPI or IDL had failed to make timely payments on notes issued to other persons. MM did not know that other lenders had not been repaid and had obtained judgments against CDI.

In November 1985, Joyce Rubenstein, from CDI's New York office, telephoned MM, informing her that if she made an additional loan to CDI, the $40,000 total loans would be repaid. When she sent the check to CDI, MM received a letter acknowledging receipt of the loan.

On October 6, 1986, the ALJ issued a discovery order, requiring relators to provide a list of persons who made loans to relators after September 1, 1983. Relators resisted on the grounds that the names of lenders to LaRouche's campaign were privileged information, and that requirement of their disclosure would somehow interfere with the first amendment right of freedom of association of CDI and its lenders.

The ALJ gave relators an alternative solution. Each relator could provide the ALJ with a comprehensive list of persons who had made loans. The ALJ would provide respondent with thirty names, chosen at random from each list, and respondent could then request additional information about the individuals chosen. The ALJ in-

---

**1.** A 12–month, $15,000 note was issued by Caucus Distributors April 16, 1985, to replace one note for $5000 and one note for $10,000, which had been made out for three years.

**2.** The loan was paid off, together with interest.

dicated that the information would be subject to a protective order providing for the confidentiality of the information, and for the return to relators of all information after a final decision was reached.

Relators deliberately did not comply with either option offered by the discovery order, continuing to claim the lists were privileged. Respondents moved for the imposition of sanctions. The ALJ denied the motion, but reaffirmed its prior order and again directed relators to comply with discovery. Relators again informed the ALJ of their decision not to comply with any discovery order. The ALJ then entered an order precluding relators from contesting portions of respondent's amended cease and desist order.

After considering the evidence, and consistent with the ALJ's recommendation, the Commissioner found that relators offered and sold unregistered securities in Minnesota, contrary to the requirement of Minn. Stat. § 80A.08, and ordered relators to cease and desist selling unfiled securities in Minnesota without obtaining an opinion letter from the department of commerce.

### ISSUES

1. Did discovery sanctions improperly deprive relators of a right to be heard?

2. Were the factual findings of the Commissioner supported by substantial evidence?

3. Do the promissory notes issued by relators constitute securities under Minn. Stat. § 80A.14?

4. Does IDL constitute a presidential campaign organization, the regulation of which is preempted by the Federal Election Campaign Act?

5. Are relators' fund-raising activities protected by the first amendment?

6. Should materials in relators' brief be stricken?

### ANALYSIS

#### I

*Discovery Sanctions*

Relators contend they had a right to protect their lists of supporters and contributors on first and fourteenth amendment and privacy grounds. They assert that the order requiring disclosure of their membership violated their supporters' rights to free association and speech.

■ The compelled disclosure of an individual's affiliation with an organization may, standing alone, constitute an intrusion into the first amendment rights of privacy of association and belief. *Jones v. Unknown Agents of the Federal Election Commission*, 613 F.2d 864, 874 (D.C.Cir. 1979) (discussing *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)).

> [A] court must be particularly mindful of potential damage to associational interests when enforcing a subpoena against minor political parties and their members.

*Federal Election Commission v. The LaRouche Campaign*, 644 F.Supp. 120, 123 (S.D.N.Y.1986) (citing *Buckley v. Valeo*, 424 U.S. 1, 71, 96 S.Ct. 612, 659, 46 L.Ed.2d 659 (1976)).

■ However, governmental interests underlying the disclosure provisions of the Federal Election Campaign Act may outweigh the possible harm to the associational rights of members of minor political parties. *See NAACP*, 357 U.S. at 463, 78 S.Ct. at 1172.

> The state's security laws are aimed at speculative schemes having no more basis than so many feet of blue sky, * * * and * * * [they are] intended to put a stop to the sale of shares in visionary oil wells, nonexistent gold mines and other "get-rich-quick" schemes calculated to despoil credulous individuals of their savings. It is a proper and needful exercise of the police power of the state and should not be given a narrow construction * * *. The commission * * * has the power, in making its investigation, to compel a full disclosure of the facts upon which to base an intelligent judgment.

*State v. Gopher Tire & Rubber Co.*, 146 Minn. 52, 55, 177 N.W. 937, 938 (1920).

This governmental interest is sufficiently compelling to outweigh the claimed infringement by relators on their right of association with their contributors.

In *LaRouche Campaign*, the Federal Election Commission (FEC) sought information to determine whether the LaRouche Campaign had reported false information about contributions and loans. The court concluded that the state's interest was sufficiently compelling to require disclosure of solicitors and contributors. *LaRouche Campaign*, 644 F.Supp. at 122. The information that could be requested by the FEC included identification of officers, directors and other members insofar as they related to persons responsible for soliciting contributions, and all bank records pertaining to loans and contributions.

Here, the information requested is even less intrusive. The discovery order did not require disclosure of the names of persons soliciting loans, officers, directors, employees and volunteers unless the lists furnished had fewer than 25 names.

Respondents claim they were prejudiced by relators' failure to provide the list. We agree. Relators point out they provided respondent with seven names. However, relators' disclosure of seven names selected by relators did not adequately comply with the order. The ALJ correctly found that relators' failure to provide the required information deprived respondent of the opportunity to prove its case, particularly to prove the instruments were securities. The sanction was appropriate.

## II

*Evidence to Support Findings of Fact*

■ Decisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to the agency's expertise and special knowledge in its field of technical training, education, and experience. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn.1977). This court must decide whether findings of fact are unsupported by substantial evidence. *Id.* at 827; Minnesota Administrative Procedure Act, Minn.Stat. § 15.0425 (1980).

■ Relators claim some of the Commissioner's findings of fact were not supported by the evidence. MM did not testify that Bettag, a consultant for relators, solicited loans from her. Relators claim there was no evidence Bettag had any role in soliciting loans.

However, respondent alleged that Bettag solicited loans. Relators' failure to comply with the ALJ's discovery order deprived respondent of the opportunity to prove this allegation. The ALJ's sanction for failure to comply with discovery precluded relators from contesting, among other things, respondent's claim that Bettag offered or sold promissory notes to persons in Minnesota. Since we affirm the discovery sanctions, we hold the Commissioner's finding was proper.

■ Relators claim the Commissioner's finding # 18 constituted an abuse of discretion:

During their telephone conversation in 1984 and 1985, [MM] and Fredman primarily talked about Caucus, but he never explained his relationship to Caucus, Campaigner or IDL. In addition, he never told her how they would repay the loans, if they had solicited loans from other persons, or if they had repaid those loans in a timely fashion.

Relators contend that it was unreasonable to assume MM did not realize that other lenders made loans to relators. The contested finding was that relators never told MM how the loans were to be paid, or about other loans or inability to make other loan payments. That finding is supported by MM's testimony that Fredman never discussed with her how CDI would repay the loans, that CDI was borrowing significant amounts of money from other persons, or that CDI had failed to make timely repayment on notes CDI had issued to other persons. She testified no one connected with CPI, IDL or CDI told her that any of those organizations had failed to make timely payments on loans to other persons.

Relators contend there was inadequate evidence to support finding # 22, that MM "considered all of her loans to [relators] as investments, not unlike certificates of deposit * * *." When asked why she made a particular loan to CDI, MM testified: "[F]or the same reason that I made the other ones. I thought it was a good investment on there." MM testified Fredman offered her a note at 16% when she told him she had money invested in a CD at 14%. MM testified that she has quite a few CD's, and thought of them and bank accounts as investments. MM testified

> as long as he told me I could give a promissory note and specify the interest and when I would get repaid, I thought it was just like something you would give to a bank. * * * I said, "Well, if it's just a loan for a year or so, I could put it in the bank anyhow, so he could have it."

MM's testimony supports the finding.

### III

*Securities*

■ The Commissioner found that "the promissory notes offered and sold by [relators] in the State of Minnesota constitute securities for purposes of Minn.Stat. § 80A.14, subd. 18 (1984)." The statute includes in its definition of "security:"

> any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest * * *.

*Id.* In a judicial or administrative proceeding under Minn.Stat. §§ 80A.01–.31, the burden of proving an exemption or an exception from a definition is upon the person claiming the exemption or exception. Minn.Stat. § 80A.15, subd. 4 (1984).

Both parties agree there is no applicable Minnesota caselaw defining security in a context similar to the notes at issue here. However, they agree that appropriate analysis would be under federal law interpreting the Securities Act of 1933, 15 U.S. C. §§ 77a–77bbbb, and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78kk.

Relators point out that the term "security" has the meaning given to it in the statute unless the context requires otherwise. Minn.Stat. § 80A.14, subd. 1 (1984). Relators contend that viewed in the context of the transaction, its notes are not securities within the definition of Minn.Stat. § 80A.14. Respondent agrees that it would be inappropriate to consider all notes securities, but claims the Commissioner properly found the notes at issue here to be securities.

Under a literal application of Minn.Stat. 80A.14, subd. 18, which specifically refers to notes as securities, the promissory notes would be securities. In *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985), the Supreme Court found instruments bearing the name and the usual characteristics of stock had to be treated as a security under the plain meaning of the statutory definition.

A literal interpretation is, however, inappropriate for the term "note," which

> may now be viewed as a relatively broad term that encompasses instruments with widely varying characteristics, depending on whether issued in a consumer context, as commercial paper, or in some other investment context.

*Id.* at 694, 105 S.Ct. at 2306.

Some courts have applied an investment contract analysis to determine whether a document is a security. In *Securities & Exchange Commission v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Supreme Court defined an investment contract, a security under the federal act, as:

> a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed by the enterprise.

*Id.* at 298–99, 66 S.Ct. at 1103. *See also Gopher Tire,* 146 Minn. at 56, 177 N.W. at 938 ("investment contract" found to mean contract or scheme for "placing of capital or laying out of money in a way intended to secure income or profit from its employment").

The *Howey* test has been applied to documents similar to the notes issued by relators. *See Securities & Exchange Commission v. World Radio Mission, Inc.*, 544 F.2d 535 (1st Cir.1976). World Radio Mission was a religious organization which raised funds by selling interest-bearing notes. The court found the documents were securities, both within the plain meaning of the statute and under the investment contract analysis, as applied in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). *Id.* at 852, 95 S.Ct. at 2060. Several federal courts have rejected the *Howey* test, however. *See Daily v. Morgan*, 701 F.2d 496 (5th Cir.1983); *Exchange National Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126 (2d Cir.1976).

Relators contend the courts must look for the characteristics of an investment, i.e. "the expectation of profit based upon the entrepreneurial or managerial efforts of others." *See Great Western Bank & Trust v. Kotz*, 532 F.2d 1252 (9th Cir.1976).

To determine whether the transaction under review involves an "investment" in return for "securities" within the meaning of the securities laws, we analyze the nature and degree of risk accompanying the transaction to the party providing the funds. * * * The inquiry is whether the funding party invested "risk capital."

*Id.* at 1256–57 (citations omitted). The *Kotz* court found the ultimate inquiry to be whether the lender, a bank that received an unsecured note in exchange for a loan, contributed "risk capital" subject to the entrepreneurial or managerial efforts of the issuer of the note. *Id.* at 1257.

Relators argue MM made the loans with only an expection of a set rate of interest not contingent upon the managerial or entrepreneurial efforts of relators, and therefore the loans are not securities. *See Union Planters National Bank of Memphis v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1185 (6th Cir.1981) (loan participation purchased by bank did not constitute security, where bank considered transaction a loan, not an investment, the existence of collateral strongly

suggested a commercial loan, and the interest payments were to be made from the efforts of a third party).

Here, the notes are securities under the *Kotz* test. MM's loans to relators were not collateralized; the loans made to MM and to other individuals were not isolated transactions, but part of a general offering; and the notes were not short-term demand notes. This case can be distinguished from *Union Planters*, in that the ability to repay the loan and interest was directly dependent on the fund-raising efforts of relators, and not upon the managerial or entrepreneurial efforts of some third party.

▮ Among the factors to consider when determining whether the notes were purchased as an investment or as a commercial loan are whether the notes were personal promissory notes issued by a private party; whether the notes were offered to the public; whether the issuer is the person bringing the claim; and whether the notes were procured in the solicitation of venture capital. *See Lino v. City Investing Co.*, 487 F.2d 689, 694–95 (3d Cir.1973).

Relators contend that MM did not make an investment because she expected to get back only her principal plus interest, and did not expect to share in any profits of enterprises conducted by relators. MM risked the loss of her capital in return for loans at an interest rate up to two percentage points above the rate she was receiving on her CD.

The following factors weigh in favor of finding the notes are securities under the commercial/investment dichotomy test:

1. MM is not a financial institution or commercial lender in the business of making loans to private parties;

2. The notes were not issued in connection with consumer installment transaction or real estate purchase;

3. The notes were not collateralized;

4. The sale took place outside the normal market for notes and commercial paper;

5. The sales to MM took place as part of a broader solicitation of loans from members of the public;

6. MM considered the notes an investment;[3]

7. The notes are securities within the plain meaning of the statute.

Relators point out that MM thought of the notes like certificates of deposit. Certificates of deposit issued by federally regulated banks are not securities. *Marine Bank v. Weaver*, 455 U.S. 551, 559, 102 S.Ct. 1220, 1225, 71 L.Ed.2d 409 (1982). However, relators ignore the Supreme Court's reasoning:

It is unnecessary to subject issuers of bank certificates of deposit to liability under the antifraud provisions of the federal securities laws since the holders of bank certificates of deposit are abundantly protected under the federal banking laws.

*Id.* The certificate of deposit analogy is not applicable here. MM and other lenders do not benefit from the protection of federal or state banking laws.

An important consideration is that the purpose of the securities law is to protect members of the public from fraud and imposition. *Gopher Tire*, 146 Minn. at 55, 177 N.W. 938; *see also State v. Investors Security Corp.*, 297 Minn. 1, 8, 209 N.W.2d 405, 409 (1973) (in accordance with an expansive view of our securities statutes, there has been a consistent broadening of the coverage of these statutes in Minnesota). We find, unequivocally, that this policy is furthered by our holding here that the Commissioner correctly found these notes to be securities under Minn.Stat. § 80A.14 (1984) and subject to regulation by the State of Minnesota.

## IV

### Federal Preemption

■ Relators point out that state law may be preempted where congress enacts federal statutes with the clear intent of preempting state law. *See Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984). Gen-

erally, a federal act does not supersede the police power of the state unless that was the clear and manifest purpose of Congress. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed. 2d 604 (1977) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). The federal-state balance will not be disturbed unintentionally by Congress or unnecessarily by the courts. *See id.* The test is whether, in the relationship between state and federal law as applied, the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

■ Respondent argues that Congress did not intend to preempt laws of general application outside the area of election, that there is no conflict between the federal election laws and state law, and that compliance with one does not preclude compliance with the other. We agree that Minnesota security laws, as applied here to protect Minnesota residents, do not conflict with the intent of the federal election laws.

Relators would have this court hold that the federal laws relating to elections and political activities supersede and preempt any state law provision with respect to federal office, giving appellants absolute immunity from state law simply because LaRouche has aspirations to federal office. We decline to do so.

## V

### First Amendment Arguments

■ Relators argue that because they are political organizations, the first amendment protects them from application of state regulation. *See generally Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (federal statute restricting independent spending unconstitutionally infringed on free speech

---

3. She was unwilling to make contributions in excess of $25 to appellants, but was prevailed upon to make substantial loans ($40,000), by promises of higher interest, including at one point interest two percentage points higher than interest she was currently receiving on a CD.

without compelling justification). However, the bare claim of a first amendment interest does not insulate behavior from responsible judicial scrutiny. The state has an interest in protecting citizens from abusive practices in solicitation of funds for charity, even when the charitable organization has a purpose protected by the first amendment. *See Cantwell v. Connecticut,* 310 U.S. 296, 306, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940).

■ In *World Radio Mission,* notes made in exchange for loans to a religious organization were found to be securities. World Radio Mission asserted first amendment freedom of religion rights. The First Circuit Court of Appeals found that World Radio did not solicit contributions, but stressed the security of investment. *World Radio Mission,* 544 F.2d at 538–39. The court pointed out the 12% interest rate "suggests defendants' investors were moved by something more than a donative spirit." *Id.* at 539. Having solicited funds on economic grounds, the court found, World Radio could not claim first amendment protection. MM, by her own uncontradicted testimony, stated she was induced, not by LaRouche's oratory or his political platform, but by high interest rates, to lend the money.

Similarly, relators here were not engaging in an activity protected by the first amendment when they issued promissory notes in exchange for loans. As in *World Radio Mission,* MM was motivated by "something more than a donative spirit." MM's testimony supports the Commissioner's finding that MM considered the loans investments and did not intend to make contributions. As purveyors of these "investments," relators cannot claim first amendment protection shields them from reasonable state regulation and reasonable scrutiny by the courts.

## VI

### *Striking of Appendix*

■ Respondent requests this court to strike from the appendix a copy of a loan repayment agreement of the Ronald Reagan Congressional Victory Fund. Appellant claims this is the sort of thing to which MM referred when she said

> money is lent to Democrats, Republicans right along, and then they pay it when they get it. Where they get it from or how they arrange it, I don't know about it.

The record is devoid of evidence that MM had ever seen the victory fund document, and thus no evidence exists that she either relied on it or compared the notes in question to that "loan repayment agreement." Additionally, the document was not introduced at trial. Portions of an appendix that were not before the trial court are not properly before this court. *See State v. Edmison,* 373 N.W.2d 639, 640 (Minn.Ct. App.1985), *reviewed and remanded on other grounds,* 379 N.W.2d 85 (Minn.1985).

Respondent objects to other portions of relators' brief containing information not in evidence. For instance, relators' brief refers to fund-raising activities of Republicans. Relators argue that such activities were overlooked, and that they are the victims of selective enforcement against minority political groups. The record does not support this accusation; this issue was not briefed, raised and argued to the ALJ, and will not be considered on appeal.

Respondent also challenges a statement in relators' brief alleging some states received lists of lenders from Virginia or the federal authorities, and that it was probable Minnesota also received a list of Minnesota residents who were lenders. Relators inferred from this claim that the discovery order they resisted was therefore unnecessary. Relators admit that this information was not in evidence, but assert it is common knowledge, and assert these statements were never refuted. The statement that Minnesota "may have" received such a list is, by its phrasing, speculative, and, without more, we do not consider it.

We grant respondent's motion to strike portions of relators' appendix. We note that our decision to strike these relatively immaterial portions has no bearing on our disposition of the issues in this case.

## DECISION

The ALJ's discovery sanctions did not impermissibly deprive relators of the opportunity to present issues and argue their case. The factual findings of the ALJ are supported by substantial evidence. The promissory notes relators issued constitute securities under Minn.Stat. § 80A.14. The Federal Election Campaign Act does not preempt regulation of the issuance of securities by relator Independent Democrats for LaRouche. Minnesota security laws, as applied to relators fund raising activities, do not impermissibly infringe on relator's first amendment right of association. Portions of relators' brief and appendix are stricken.

Affirmed.