577 A.2d 783

**CAUCUS DISTRIBUTORS, INC. et al.**

v.

**MARYLAND SECURITIES COMMISSIONER.**

No. 138, Sept. Term, 1989.

Court of Appeals of Maryland.

Aug. 9, 1990.

314

Patrick J. Moran, Moran & Bladen, P.C., Houston, Tex. on brief, for appellant.

Kathryn M. Rowe, Asst. Atty. Gen., J. Joseph Curran, Jr., Atty. Gen., Annapolis, on brief, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and CHASANOW, JJ.

MURPHY, Chief Judge.

The principal questions presented are whether certain promissory notes, issued by a nonprofit corporation, are within the definition of a "security" under the Maryland Securities Act (the Act), Maryland Code (1985 Repl.Vol.), §§ 11–101 through 11–805 of the Corporations and Associations Article; and whether, if they are securities, the Act's regulatory provisions constitute an infringement upon the organization's First Amendment rights of political speech and association.

## I.

Caucus Distributors, Inc. (Caucus) is a nonprofit publishing and fundraising organization incorporated under the laws of New York, which espouses political· viewpoints consistent with those expressed by Lyndon H. LaRouche, Jr. Caucus is not registered or qualified to transact business in Maryland. Acting through unregistered agents, Caucus sold two of its uncollateralized promissory notes totalling $100,000 to Grace Lindeman, a 79–year–old woman living in a retirement community in this State. The notes were to mature in 1 year from their issuance and carried an interest rate of 12% or over. When the issuance of the notes was brought to the attention of the Attorney General of Maryland, these proceedings were initiated pursuant to the provisions of the Act.

### (A)

The Act, in § 11–201, creates a Division of Securities in the Office of the Attorney General of Maryland, the principal executive officer of which is the Maryland Securities Commissioner. Section 11–301 makes it unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, to

"(1) Employ any device, scheme, or artifice to defraud;

(2) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person."

A "security" is defined by § 11–101(*o*) to mean, *inter alia,* "any: (i) Note."[1] Section 11–501 makes it unlawful for any person to sell any security in Maryland unless it is registered under the Act or is exempt from registration. Section 11–601 sets forth a list of exempt securities which includes, in subsection (9), any security "issued by any person organized and operated: (i) Not for private profit but exclusively for religious, educational, benevolent, charitable, fraternal, social, athletic, or reformatory purposes...." Section 11–603 authorizes the Securities Commissioner to summarily deny or revoke, by order, any

---

1. In full, this subsection provides:

"(*o*) *Security.*—(1) 'Security' means any:

(i) Note;

(ii) Stock;

(iii) Treasury stock;

(iv) Bond;

(v) Debenture;

(vi) Evidence of indebtedness;

(vii) Certificate of interest or participation in any profit-sharing agreement;

(viii) Collateral-trust certificate;

(ix) Preorganization certificate or subscription;

(x) Transferable share;

(xi) Investment contract;

(xii) Voting-trust certificate;

(xii) Certificate of deposit for a security;

(xiv) Certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under the title or lease; or

(xv) In general, interest or instrument commonly known as a 'security'; or

(xvi) Certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase any of the preceding."

exemption specified in § 11–601(9) "pending final determination of any proceeding under this subsection." Upon the entry of such summary order, the Commissioner is required to notify every interested party that it has been entered, the reasons for its entry, and that within 15 days "of the receipt of a written request, the matter will be set down for hearing." Section 11–603(c) provides that if a hearing is not requested, or ordered by the Commissioner, the summary order will remain in effect unless modified or vacated by the Commissioner. If a hearing is requested, the Commissioner is enjoined to afford notice and opportunity for hearing to every interested person, and thereafter may modify or vacate the order, or extend it until final determination.

Section 11–701 authorizes the Commissioner to conduct investigations to determine whether any person has violated, or is about to violate, any provisions of the Act. Section 11–701(a)(4) authorizes the Commissioner to "[i]ssue a cease and desist order as to any practice or act found by the Commissioner to be in violation of this title provided that notice and opportunity for a hearing are given to each person named in the order." Section 11–701(b) authorizes the Commissioner, in the course of any investigation, to take evidence under oath. Section 11–704 provides that any person aggrieved by a final order of the Commissioner may obtain a review of the order "in conformity with the procedure prescribed in the Maryland Rules of Procedure and in the Administrative Procedure Act."

### (B)

Following an investigation into the sale by Caucus of promissory notes to Lindeman, the Securities Commissioner issued a cease and desist order on March 11, 1986; it directed that Caucus, and its unlicensed agents, Kathy Wolfe and Paul Gallagher, cease operating in violation of the antifraud provisions of § 11–301. The order further directed that Wolfe and Gallagher cease acting as agents of Caucus and that Caucus cease employing unregistered

agents in the State. The Commissioner also summarily revoked the exemption of the sale of securities by Caucus under § 11–602(9) and directed it to show cause why an order permanently revoking its statutory exemption should not be entered. Finally, the cease and desist order provided that a failure by Caucus, Wolfe or Gallagher, to request a hearing within 15 days, as permitted by § 11–603(c), would result in the entry of a final order. In a timely answer, Caucus denied the alleged violations of the Act. It claimed that the cease and desist order unconstitutionally deprived it of its right of political expression without a predeprivation hearing and it requested a hearing before the Securities Commissioner. Neither Wolfe nor Gallagher answered the cease and desist order nor requested a hearing, although each appeared and participated in the administrative hearing on June 6 and 9, 1986.

The evidence at the administrative hearing conducted by a hearing examiner disclosed that Kathy S. Wolfe, a volunteer for Caucus and an employee of a publishing enterprise known as Executive Intelligence Review (EIR), contacted Lindeman on July 22, 1985 by telephone and sold her a subscription to EIR for $250. The unsolicited call and sale were part of a fundraising program for Caucus. Additional fundraising for Caucus was achieved by its issuance of interest-bearing promissory notes to an undetermined number of persons who acquired them in response to solicitation by Wolfe and other representatives of Caucus. Potential patrons of Caucus's fundraising campaigns were identified through lists of thousands of names taken from telephone books for "conservative neighborhoods" and subscribers to conservative publications. Representatives of Caucus called up to three hundred names a day to discuss the teachings of Lyndon LaRouche and world affairs. Lindeman's name and telephone number were discovered in this general manner.

Lindeman's expressed interest in the political activities described by Wolfe during their telephone conversation prompted Wolfe to call her four days later. At this time,

she told Lindeman of Caucus's need for money to translate into Spanish a book about an alleged connection between the International Monetary Fund and the international drug trade. The book was targeted for distribution in South and Central America. Wolfe told Lindeman that while some funds belonging to Caucus had recently been impounded, investments in Caucus would be safer and pay a higher interest rate than would a bank. During this conversation, Wolfe asked Lindeman if she had money available to make an investment. Lindeman responded that she had a $64,000 certificate of deposit due to mature on November 2, 1985, which paid 10.8% interest.

Wolfe told Lindeman that she could borrow against her certificate of deposit and the greater interest that Caucus would pay her would more than compensate for the interest she would pay on her loan with the bank. Wolfe added that the higher rate of return was an incentive for Lindeman to invest with Caucus rather than a bank, and that she probably would not receive such a high rate if she merely reinvested the certificate of deposit. Wolfe also informed Lindeman that Caucus would generate the money to repay her investment through the sale of its publications. Wolfe did not tell Lindeman that payment of the notes would be made with money raised by the issuance of other promissory notes to other purchasers. Shortly after this telephone conversation, Lindeman sent a check for $10,000 to Caucus and subsequently acquired a loan for $50,000 from her bank, secured by her certificate of deposit, against which she wrote a $50,000 check to Caucus. The 1–year note she received from Caucus was for $60,000 with an interest rate of 12.8%, payable quarterly. The uncollateralized note was due on July 31, 1986.

On August 1, 1985, Wolfe and another volunteer for Caucus, Paul Gallagher, visited Lindeman in her home for the purpose of raising additional funds from her. Gallagher was an employee of the Fusion Energy Foundation, a political organization associated with Caucus. Upon his suggestion, Lindeman contacted her bank and discovered

she had $40,000 available in a trust fund drawing almost 8% interest. After Wolfe and Gallagher told Lindeman that Caucus would pay 12% interest on her $40,000 investment, Lindeman wrote Caucus a check for this amount, dated August 5, 1985. Lindeman received a 1–year $40,000 promissory note from Caucus, bearing an interest rate of 12%, payable quarterly. This note was also uncollateralized and was due on August 5, 1986.

The evidence disclosed that neither Wolfe nor Gallagher was registered as an agent of Caucus under the Act. There was no evidence that either provided Lindeman with financial information about Caucus or the names of its officers and directors. Nor did Lindeman receive any detailed information regarding the pending legal actions against Caucus in Massachusetts and New Jersey, although she was generally made aware of the litigation. Wolfe informed Lindeman that the source of repayment would be revenues derived from sales of Caucus's literature and from additional contributions; however, she failed to disclose that Caucus's ability to repay the loans depended in part upon its ability to borrow money from other persons through the issuance of other promissory notes. Nor was there any evidence that Wolfe or Gallagher provided Lindeman with information regarding Caucus's degree of dependence on several different sources of revenue or the extent to which Caucus's ability to repay would be affected by the pending litigation in other states. Lindeman did receive written materials during the August 1, 1985 meeting with Wolfe and Gallagher, which expressed Caucus's political views; but the material contained no significant information about Caucus's management, its financial status, or its sources of revenue.

Lindeman testified at the hearing that she viewed the transactions as an investment; that she would not have provided the money to Caucus as a gift, nor loaned the money at an interest rate lower, or for a longer period, than provided in the notes. She felt pressured to provide the money to Caucus due in part to the nature of the questions

of Wolfe and Gallagher and the general circumstances of their meetings. The evidence indicated that Lindeman was an unsophisticated investor, widowed from her husband who had handled the family's finances. Her bank funds were managed by her attorney and bank personnel, and her children held powers-of-attorney for certain of her affairs.

The hearing examiner, based on the evidence adduced at the hearing, made the following proposed conclusions of law:

"1. The Notes constitute securities within the meaning of section 11–101(o)(i) of the Act.

2. The transaction between Caucus and Lindeman constituted an 'offer' and 'sale' of securities by Caucus within the meaning of sections 11–101(j) and (m) of the Act.

3. Wolfe and Gallagher were issuer's agents within the meaning of section 11–101(b)(1) of the Act, and they violated section 11–401 of the Act by transacting business in Maryland as agents without registration under the Act.

4. Caucus violated section 11–402 of the Act by employing Wolfe and Gallagher as agents in Maryland when Wolfe and Gallagher were not registered as agents under the Act.

5. By misrepresenting and failing to disclose material facts to Lindeman in connection with the offer and sale of securities to her, Caucus, Wolfe and Gallagher violated section 11–301 of the Act.

6. The actions of the Commissioner and the Division have not infringed upon Caucus's constitutional rights of expression and association.

7. The issuance of the Cease and Desist Order, the Revocation Order and the Show Cause Order without a prior hearing did not deprive Caucus of its constitutional right of due process of law.

8. The Cease and Desist Order shall not be vacated or modified, but rather entered as final, and a final order

permanently revoking Caucus's exemption under § 11–601(9) of the Act shall be entered."

The Securities Commissioner adopted the findings and conclusions of the hearing examiner and entered a final order in the case on January 16, 1987. As of that time, Lindeman had not recovered her principal or interest from Caucus.

On February 12, 1987, Caucus, Wolfe and Gallagher appealed to the Circuit Court for Baltimore City. The appeals by Gallagher and Wolfe were thereafter dismissed by the court as untimely filed. On June 16, 1989, the court (Kaplan, J.) affirmed the final order of the Securities Commissioner. Caucus, Wolfe and Gallagher then appealed to the Court of Special Appeals. We granted certiorari prior to a decision by that court to resolve the important questions presented in the case.

## II.

The standard and scope of review of the Security Commissioner's order is set forth in the Maryland Administrative Procedure Act, Code (1984), § 10–215 of the State Government Article. Subsection (g)(3) provides that a reviewing court may

"reverse or modify the decision [of the agency] if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision of the agency:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the agency;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious."

In determining whether an agency's decision is supported by substantial evidence, we are mindful that

substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *State Election Bd. v. Billhimer,* 314 Md. 46, 548 A.2d 819 (1988). In applying the substantial evidence test, we must not substitute our judgment for the expertise of the agency, *Supervisor v. Asbury Methodist Home,* 313 Md. 614, 547 A.2d 190 (1988), for the test is a deferential one, requiring "restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions." *Id.* at 625, 547 A.2d 190. This deference applies not only to agency fact-finding, but to the drawing of inferences from the facts as well. *St. Leonard Shores Joint Ven. v. Supervisor,* 307 Md. 441, 447, 514 A.2d 1215 (1986). When, however, the agency's decision is predicated solely on an error of law, no deference is appropriate and the reviewing court may substitute its judgment for that of the agency. *Washington Nat'l Arena v. Comptroller,* 308 Md. 370, 378–79, 519 A.2d 1277 (1987); *Ramsay, Scarlett & Co. v. Comptroller,* 302 Md. 825, 490 A.2d 1296 (1985). In brief, so long as the agency's decision is not predicated solely on an error of law, we will not overturn it if a reasoning mind could reasonably have reached the conclusion reached by the agency.

■ In analyzing whether the promissory notes issued by Caucus in this case were "securities" under § 11–101 of the Maryland Act, we consider the interpretation of that same term by federal courts under substantially similar language contained in the Securities Act of 1933, 15 U.S.C. § 77b(1) and the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10). We note in this regard that § 11–804 of the Maryland Act mandates that "[t]his title shall be construed to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and administration of this title with the related federal regulation."

The Securities Commissioner, after considering various test criteria formulated by a number of federal courts, found that the notes issued by Caucus were securities under the Maryland Act. The Supreme Court, in *Reves v.*

*Ernst & Young,* —— U.S. ——, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990), consolidated the criteria applied by the lower federal courts into a four-part test. *Reves* involved uncollateralized and uninsured promissory notes issued by the Farmer's Cooperative of Arkansas and Oklahoma to raise money for its general business operations; the question was whether the notes were securities within the meaning of § 78c(a)(10) of the Securities Exchange Act of 1934. The Court noted that there was a presumption "that *any* note with a term of more than nine months is a 'security.'" *Reves,* 110 S.Ct. at 950 (emphasis in original). At the same time, it recognized that not all notes are securities and that courts had devised a list of notes that obviously were not securities. Therefore, the Court said that the presumption could be rebutted where the issuer showed "that the note in question 'bear[s] a strong family resemblance' to an item on the judicially crafted list of exemptions, or convinces the court to add a new instrument to the list." *Id.,* quoting in part from *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1137–38 (2nd Cir.1976). In determining whether an instrument belongs on the list, the Court said that it was necessary to first

> "examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it. If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.' If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a 'security.'" *Id.* 110 S.Ct. at 951–52.

Second, the court examined the "plan of distribution" of the instrument to determine whether it is one in which there is common trading for speculation or investment. *Id.* at 952. Third, the reasonable expectations of the investing public

must be examined in considering whether instruments were "securities," even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not "securities." *Id.* Fourth, the Court said it was essential to examine whether some factor, such as the existence of another regulatory scheme, significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary. Applying these criteria, the Court concluded in *Reves* that the promissory notes before it were securities subject to regulation.

In utilizing these principles, and finding that the Caucus notes were securities, the Security Commissioner found that Caucus was involved in the publishing and distribution of books and periodicals on a national and international scale; that it sought to raise money for its enterprise purpose, *e.g.*, to translate one of its books into Spanish for the purpose of distribution in South and Central America; and that Lindeman, although interested in similar political objectives, was essentially motivated by the expected profit to be generated from the acquisition of the notes. Indeed, the Commissioner found as a fact that Lindeman would not have donated the $100,000, nor invested it at an interest rate equal to or less than she was earning on her bank funds.

As to these findings, Caucus claims that "the repayment of principal plus a fixed rate of interest is not an expectation of profits," because it is "not contingent upon the entrepreneurial efforts of others," relying indirectly on the test formulated in *S.E.C. v. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946) (an investment contract, which is a "security" under the 1933 Act, is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise"). *Reves*, 110 S.Ct. at 951, specifically rejected the application of the *Howey* test to notes. It determined that

"by 'profit' in the context of notes, we mean 'a valuable return on an investment,' which undoubtedly includes interest." *Id.* at 952 n. 4, quoting in part from *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975).

As to the second factor in *Reves,* we think the Securities Commissioner effectively concluded that the plan of distribution of the instrument existed in a circumstance of common trading for speculation or investment. As noted in *S.E.C. v. Joiner Corp.,* 320 U.S. 344, 352–53, 64 S.Ct. 120, 124–25, 88 L.Ed. 88 (1943), cited with approval in *Reves* 110 S.Ct. at 952: "The test ... is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." In *Joiner,* the Supreme Court held that the sale of leasehold interests in land near a proposed oil well drilling were securities under the Securities Act of 1933, suggesting that "[i]n the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be." *Id.* at 353, 64 S.Ct. at 124.

Caucus argues that the loans "were made by an individual who supported their goals," perhaps to imply that these transactions were isolated transactions and not part of a more extended public offer. While it may be true that Lindeman supported the goals of Caucus, this claim does not undermine the Commissioner's determination that the notes were securities under the Act. It may be that some investors, partial to the aims of an organization, may extend loans to that organization, even though they present a greater risk than those of more secure investments, such as a certificate of deposit at a bank. But as the evidence in the record discloses, and as the Commissioner found, Caucus's sale of its notes was neither isolated nor discriminating. Indeed, it raised funds by selling promissory notes to an undetermined number of persons, contacted through general solicitations by Wolfe and other of its representatives. Caucus's use of telephone books to identify conserv-

ative neighborhoods does not represent a discriminating method for selling notes when up to 300 names a day are targeted for solicitation. That Lindeman was actually contacted by this method offers additional support for the Commissioner's determination that her solicitation was not significantly different from other general solicitations in the securities business. In *Reves,* where the defendants offered notes over an extended period to its 23,000 members and other nonmembers, the Court said the notes "were ... offered and sold to a broad segment of the public, and that is all we have held to be necessary to establish the requisite 'common trading' in an instrument." *Id.* 110 S.Ct. at 953. It is readily apparent on the record before us that the only pertinent factor in Caucus's consummation of the sale of its notes was the willingness of the offeree to loan the money. We see it, as the Commissioner saw it—the political affiliation of the offeree was more a consequence of the solicitation criteria than an example of Lindeman's seeking Caucus as a conduit for political expression and association.

Under the third factor of *Reves,* it is plain to us, as it was to the Commissioner, that a reasonable public expectation existed that Caucus's notes were securities. Certainly, they fit within the literal meaning of a security under the statute. And even though a name given to a security is not dispositive, *see United Housing Foundation, Inc. v. Forman, supra,* 421 U.S. at 848, 95 S.Ct. at 2058, the nature of Caucus's notes suggests that they embody "some of the significant characteristics typically associated with the named instrument." *Id.* at 851, 95 S.Ct. at 2060. For example, Webster's Third New International Dictionary, respectively at 1544 and 1815 (1961) defines a "note" as "a written or printed paper acknowledging a debt and promising payment: a written promise to pay;" and "promissory note" as "an unconditional written promise to pay on demand or at a fixed or determined future time a given sum of money to or to the order of a specified person or to bearer." The notes issued by Caucus to Lindeman meet the common definitions of these terms.

Additionally, as the Commissioner found, the representations made to Lindeman emphasized that the notes were investments. Indeed, the evidence showed that Caucus agents repeatedly used the phrase "investment," in acquiring Lindeman's funds, made several comparisons to banks and relative safety regarding such investments, and promised a higher rate of return than that available from a bank as inducement to make the loans. The Commissioner found that Lindeman would not have provided the funds as a gift or at an interest rate below that obtained from the bank, an indication that she believed that she was entering into an investment relationship with Caucus.

Finally, under the fourth criterion outlined in *Reves*, the lack of another regulatory scheme that would significantly reduce the risk of acquiring notes like those here in question is compelling evidence of the need for applying the protections afforded by the Maryland Act. Caucus argues that general antifraud laws would fulfill the State's interest in deterring fraud, thus rendering the act unnecessary in this context. However, "[t]he fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.'" *Reves*, 110 S.Ct. at 949. The Maryland Securities Act is founded on the same premise. *See, e.g.,* Ch. 552 of the Acts of 1920; Ch. 348 of the Acts of 1937; Ch. 1 of the Acts of 1962; and Ch. 615 of the Acts of 1976. *See also,* Report of Committee to Study the Administration of the Blue Sky Law of Maryland (1961) 2–3. State blue sky laws requiring licensing and registration have a long history of acceptance as permissible exercises of police powers in the prevention of fraudulent intrastate commercial trading. *See e.g., Hall v. Geiger–Jones Co.,* 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480 (1917); *Caldwell v. Sioux Falls Stockyards Co.,* 242 U.S. 559, 37 S.Ct. 224, 61 L.Ed. 493 (1917); and *Merrick v. Halsey & Co.,* 242 U.S. 568, 37 S.Ct. 227, 61 L.Ed. 498 (1917).

The substantial risk of Caucus's uncollateralized and uninsured notes would have been more comprehensible to Lindeman had Caucus fulfilled the disclosure and registra-

tion requirements under the Maryland Act. Without some measure of regulation, *i.e.*, registration of securities and agents who sell them, the State would be without the means necessary to prevent fraudulent or spurious sales. The sale of notes in the manner shown here presents potentially abusive practices in the absence of other risk-reducing factors.

In a strikingly similar case, the Supreme Court of Alaska recently concluded that the sale of unsecured promissory notes by Caucus representatives to two individuals was activity regulated by that state's blue sky laws. *Caucus Distributors, Inc. v. State of Alaska*, 793 P.2d 1048 (Alaska 1990). The court relied on the four-part test of *Reves* in holding that the promissory notes were indeed securities.

In Minnesota, the Court of Appeals also held that notes sold by Caucus under corresponding facts were securities under state law because the buyer of the notes was not in the business of making loans; the buyer considered the notes an investment; they were not issued in connection with a consumer installment transaction or real estate purchase; they were not collateralized; the sale took place outside the normal market for notes and commercial paper, and was part of a broader solicitation of loans from the public; and the notes were within the plain meaning of the statute. *Caucus Distributors v. Com'r of Commerce*, 422 N.W.2d 264 (Minn.Ct.App.1988), *cert. denied*, 488 U.S. 1006, 109 S.Ct. 786, 102 L.Ed.2d 778 (1989).

We thus conclude that there was substantial evidence to support the Commissioner's factual determinations and that, in finding the Caucus promissory notes to be securities within the contemplation of the Maryland Act, the Commissioner committed no error of law.

### III.

Caucus next maintains that mandatory compliance with the Maryland Securities Act is an unconstitutional infringement on its First Amendment rights. Specifically,

it asserts that the Act's filing requirements would be costly and "permit a close monitoring by governmental authority of the publication viewpoints of the organization."

Caucus's argument assumes that the sale of its notes is a form of political speech protected by the First Amendment. The evidence before the Commissioner, however, suggests otherwise. Indeed, before and during the actual sale of the notes, Wolfe and Gallagher uniformly stressed the security of the notes as investments paying interest rates of 12 and 12.8%. Lindeman was induced to loan the money to Caucus because of the notes' alleged security and competitive interest rates. Additionally, Caucus's solicitations for loans were directed at a broad segment of the public, indicating that Caucus was not relying on investors' membership or political affiliation with Caucus. Rather, it was principally engaged in a public offering of its securities, which centered on economic considerations.

Our view that no First Amendment interests of Caucus are infringed in this case would remain unchanged even if these transactions could be classified as charitable contributions in nature and hence to become protected speech. *See generally, Riley v. National Federation of the Blind of N.C.*, 487 U.S. 781, 789, 108 S.Ct. 2667, 2673–74, 101 L.Ed.2d 669 (1988); *Secretary of State of Md. v. J.H. Munson Co.*, 467 U.S. 947, 959–61, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); and *Schaumburg v. Citizens for Better Environ.*, 444 U.S. 620, 632–33, 100 S.Ct. 826, 833–34, 63 L.Ed.2d 73 (1980), holding that solicitation for charitable contributions is protected by the First Amendment as the dissemination of ideas. But, as the court stated in *Caucus Distributors v. Com'r of Commerce, supra,* 422 N.W.2d at 273, "[t]he state has an interest in protecting citizens from abusive practices in solicitation of funds for charity, even when the charitable organization has a purpose protected by the first amendment," citing, *Cantwell v. Connecticut*, 310 U.S. 296, 306, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940) (dictum) ("Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity,

commit frauds upon the public. Certainly penal laws are available to punish such conduct.... Without a doubt a State may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent.").

The state interest in protecting against securities fraud is legitimately served by the registration, disclosure, and antifraud provisions of the Act. In *Riley, supra,* the Supreme Court struck down a state law regulating charitable solicitations by professional fundraisers as an unconstitutional infringement on free speech. There, the law prescribed a range of permissible fees that a fundraiser could charge as a percentage of gross revenues solicited. The law also required the fundraiser to disclose to prospective donors the gross percentages of revenues previously retained by charitable solicitations and required the fundraiser to be licensed prior to any solicitation. In striking down the portion of the act relating to permissible fees, the Court said:

"[W]e do not suggest that States must sit idly by and allow their citizens to be defrauded. North Carolina has an antifraud law, and we presume that law enforcement officers are ready and able to enforce it. Further North Carolina may constitutionally require fundraisers to disclose certain financial information to the State, as it has since 1981." 487 U.S. at 795, 108 S.Ct. at 2676.

The Court in *Riley* also invalidated the required disclosure to potential donors concerning the percentage of charitable contributions collected during the previous 12 months that were actually received by the charity. Instead, the Court endorsed "more benign and narrowly tailored options" for protecting against fraudulent fundraising by suggesting that "the State may itself publish the detailed financial disclosure forms it requires professional fundraisers to file ... [a]lternatively, the State may vigorously enforce its antifraud laws to prohibit professional fundraisers from

obtaining money on false pretenses or by making false statements." *Id.* at 800, 108 S.Ct. at 2679.

In *Munson, supra,* the Supreme Court affirmed this Court's judgment invalidating a Maryland law regulating contracts between professional fundraisers and charities. The law forbade contracts permitting a fundraiser to retain more than 25% of money solicited, after allowing for deductions attributable to the solicitation costs. The Court found such restriction violative of First Amendment interests as it was a direct restriction on the amount of money a charity could spend on fundraising activity, and the asserted governmental interest in preventing fraud was not specifically advanced by the law. Nor was the law saved by a provision allowing a waiver whenever the 25% limitation would effectively prevent the charitable organization from raising contributions. Although the Court held that there was a tenuous connection between the percentage of funds retained by a fundraiser and the likelihood that the solicitation is fraudulent, it said that "concerns about unscrupulous professional fundraisers, like concerns about fraudulent charities, can and are accommodated directly, through disclosure and registration requirements and penalties for fraudulent conduct." *Munson* at 967–68 n. 16, 104 S.Ct. at 2852–53 n. 16.

In *Schaumburg, supra,* the Supreme Court overturned a city ordinance prohibiting door-to-door or on-street solicitation for contributions by charitable groups unless the groups directly used at least 75% of the funds obtained for "charitable purposes." The Court held that the 75% requirement was not narrowly tailored to the legitimate government interest of preventing fraud and protecting public safety. The justification for the percentage requirement was the assumption that an organization which spends more than 25% of its contribution receipts on solicitation costs was a commercial, and not, charitable entity. The Court said there was no necessary connection between the 75% requirement and the state's interest in preventing fraud. It said that the government could pursue its inter-

ests through means less destructive of First Amendment activities by enforcement of already existing laws prohibiting fraud and requiring financial disclosure and registration with the state attorney general. To this end, the Court noted:

"Efforts to promote disclosure of the finances of charitable organizations also may assist in preventing fraud by informing the public of the ways in which their contributions will be employed. Such measures may help make contribution decisions more informed, while leaving to individual choice the decision whether to contribute to organizations that spend large amounts on salaries and administrative expenses." *Schaumburg* at 637–38, nn. 11–12, 100 S.Ct. at 836–37 nn.11–12.

These cases demonstrate that informing the public and preventing fraud are substantial governmental interests, and the required registration and disclosure of certain facts relating to the organizations' structure and fundraising activities do not unduly intrude upon the rights of free speech.

Under the Maryland Securities Act, Subtitle 4 requires all agents employed by broker-dealers or issuers to register with the Securities Commissioner. § 11–402. All registered broker-dealers are required to maintain records of accounts, correspondence, memoranda, and other papers so prescribed by the Commissioner. § 11–411(a); COMAR § 02.02.02.05 and .06. These records may be inspected by representatives of the Commissioner when "necessary or appropriate in the public interest or for the protection of investors." § 11–411(d). In addition, registered broker-dealers are required to file financial reports with the Commissioner. § 111–411(b); COMAR § 02.02.02.04. The Act provides that all securities sold in the State be registered with the Commissioner unless otherwise exempted. § 11–501. Securities may be registered by notification, § 11–502; by coordination, § 11–503; or by qualification, § 11–504. All three methods request general information relating to the identity and background of the issuer, the

security offered and terms of the offer. In addition, every registration statement must specify "[t]he amount of securities to be offered in this State; ... [t]he states in which a registration statement or similar document in connection with the offering has been or is to be filed; and ... [a]ny adverse order, judgment, or decree entered in connection with the offering by the regulatory authorities in each state, any court, or the Securities and Exchange Commission." § 11–507(a). Each registrant must also consent to service of process with the Commissioner, § 11–802(a), and may be required by the Commissioner to file sales literature and other advertisements intended for distribution to prospective investors or clients. § 111–205; COMAR § 02.02.03.08.

These provisions are designed to provide an avenue for investors to discover exaggerations, omissions or inaccurate statements of fact made by solicitors, thus allowing those solicited an opportunity to verify representations made as inducement to buy securities. In the same regard, information garnered from these requirements directly enhances the State's ability to enforce the antifraud provisions of the Act, as well as its general antifraud laws.

The Commissioner did not accept Caucus's argument that disclosure of generally content-neutral facts concerning its offering promoted "a close monitoring by governmental authority of the publication viewpoints of [Caucus]." Caucus presented no evidence supporting this assertion or demonstrating that compliance would restrict its political expression or association. Even if the registration and disclosure requirements imposed an economic burden upon its fundraising objectives, § 11–601 of the Act extends an exemption status to designated nonprofit enterprises which would alleviate that burden. If Caucus qualified for and retained the exemption, it would not have had to register its securities under § 11–501 or file with the Commissioner sales and advertising literature under § 11–205, thereby significantly reducing any impediment to First Amendment pursuits. The other requirements under the Act, however,

would still directly serve the substantial state interest of discouraging misrepresentations of fact by requiring basic information about the nature of the organization and its agents. Neither method of registration is a device to suppress free speech or deter political association; instead, the Act extends to the public a precise measure for protecting against fraudulent sales of securities.

The record before us clearly supports the determination of the Securities Commissioner that there was no First Amendment violation in this case. Nor did the Commissioner err when he revoked the exemption that Caucus, as an eligible nonprofit organization, may have been entitled to under § 11–601(9) of the Act. Indeed, the issuance of the cease and desist order by the Commissioner was amply justified by the evidence that the sale by Caucus of its promissory notes ran afoul of the antifraud provisions of § 11–301 of the Act. The Supreme Court of Alaska, in *Caucus Distributors, Inc. v. State of Alaska, supra,* reached the same conclusion on a record very similar to that here involved.[2]

## IV.

Wolfe and Gallagher contend that the circuit court erred in dismissing their appeals from the Commissioner's final cease and desist order of January 16, 1987.

As earlier indicated, the Commissioner's cease and desist order was issued on March 11, 1986. Neither Gallagher nor Wolfe had a Maryland address and neither could be located for service of process. As authorized by § 11–802(b)(1), the cease and desist order was served upon them by service upon the Securities Commissioner.

---

**2.** In fact, Caucus is the subject of cease and desist orders issued in Indiana, Minnesota and Washington, and a proceeding in Illinois, all related to its fundraising activities. *See Caucus Distributors, Inc. v. State of Alaska, supra.*

■■■■ The Securities Commissioner adopted the hearing examiner's determination that Wolfe and Gallagher voluntarily participated as parties in the administrative proceedings of June 6 and 9, 1986. The assertion by Wolfe and Gallagher of improper service of process is effectively an attack on the *in personam* jurisdiction of the tribunal. While in administrative proceedings, failure to give notice to a party of the proceeding may result in a vacation of its decision, *Cassidy v. Board of Appeals*, 218 Md. 418, 421–22, 146 A.2d 896 (1958), a party's appearance and participation in the proceedings will waive this deficiency. This is consistent with the common understanding in this State that a general appearance by an individual is a submission to the personal jurisdiction of the court over that person. *Steinpreis v. Miller*, 241 Md. 79, 215 A.2d 737 (1966); *McCormick v. Church*, 219 Md. 422, 149 A.2d 768 (1959); and *Howell v. Beth.–Spar. Pt. Shipyard*, 190 Md. 704, 59 A.2d 680 (1948). After fully participating in the hearing without objection, Wolfe and Gallagher waived any deficiency in the alleged failure of service of process.

JUDGMENT AFFIRMED, WITH COSTS.