838 A.2d 1225

## TOWN OF EASTON

v.

## PUBLIC SERVICE COMMISSION OF MARYLAND.

No. 28, Sept. Term, 2003.

Court of Appeals of Maryland.

Dec. 19, 2003.

Francis X. Wright (Eastwick Rose Wright & Levine, P.A. of Baltimore; Christopher B. Kehoe of Ewing, Dietz, Turner & Kehoe, P.A. of Easton,) all on brief, for appellant.

Tracey L. Stokes, Assistant General Counsel (Susan Stevens Miller, General Counsel, Baltimore,) and Thomas C. Gorak (Teresa M. Bay of Gorak & Bay, L.L.C. of Kailua–Kona, Hawaii; Michael J. Travieso, Richard T. Miller of Maryland Office of People's Counsel, Baltimore,) all on brief, for appellee.

Argued Before BELL, C.J., and ELDRIDGE,[*] RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

CATHELL, J.

This case concerns whether the Town of Easton, Maryland, petitioner, in annexing 217.1 acres of land, can be deemed to have sole electric service provider rights to the annexed area, thereby extinguishing Choptank Electric Cooperative, Inc.'s ("Choptank") electrical service rights to the same area. To put it in its simplest terms, this is a dispute between petitioner, on the one hand, and Choptank, on the other, over who has the authority to provide electrical service to the annexed area.

On March 5, 2001, petitioner filed a petition with the Public Service Commission ("Commission"), respondent, for authority to provide electric service to the entirety of the annexed land. On May 25, 2001, the case was delegated by the Commission to the Hearing Examiner Division.[1] The Hearing Examiner issued a Proposed Order dated January 18, 2002, which found that Choptank was legally authorized to continue to provide electric service to the portion of the annexed land within its service territory. On May 9, 2002, the Commission unanimously adopted the Hearing Examiner's Proposed Order. On May 28, 2002, petitioner filed in the Circuit Court for Talbot County a Petition for Judicial Review of the Commission's

---

[*] Eldridge, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Md.Code (1998), § 3–104(b)(1) of the Public Utility Companies Article states that "[t]he Commission, a commissioner, or a hearing examiner may conduct hearings, examine witnesses, administer oaths, and perform any other acts necessary to the conduct of proceedings."

Order. In a well-reasoned decision dated January 14, 2003, Judge William S. Horne of the Circuit Court affirmed the Commission's Order. On January 30, 2003, petitioner filed an appeal of the Circuit Court's decision with the Court of Special Appeals. On June 19, 2003, prior to consideration by the Court of Special Appeals, we issued a Writ of Certiorari. *Easton v. PSC,* 376 Md. 49, 827 A.2d 112 (2003). Petitioner presents two questions for our review:

"1. Can a rural electric cooperative lawfully provide electric service to the residents of a new housing development located within the boundaries of a Maryland municipal corporation without the consent of the governing body of that municipality?

"2. Did the Public Service Commission of Maryland err in arbitrarily denying most of the residents of a new housing development in Easton of their right to receive electrical service from the utilities department of that municipality?"

In regard to petitioner's first question, we hold that Choptank does not need petitioner's consent to provide service in the disputed area, that petitioner has no right or authority on its own to expand electric service into the area currently serviced by Choptank, and that only through the procedure established in § 7–210(d) of the Public Utility Companies Article can the existing service boundaries between petitioner and Choptank be altered.

In answering petitioner's second question, we hold that the Commission did not err in maintaining the historical territorial electrical service area that Choptank was granted by the Commission in a 1966 Order. There exists no fundamental personal right for Easton Club East ("ECE") residents to receive electrical service from petitioner or from any specific provider, nor are the ECE residents' Equal Protection rights violated by the Commission's decision.[2] Accordingly, we affirm the judgment of the Circuit Court for Talbot County.

---

2. As far as the record reflects, no ECE residents are named parties to this proceeding.

## I. Facts

On March 5, 2001, pursuant to Md.Code (1998), § 7–210(d) of the Public Utility Companies Article,[3] petitioner filed a petition seeking authority from the Commission to exclusively supply electricity to an area annexed by petitioner in 1993. The annexed area that is the subject of the petition is known generally as "Lyons Farm" and consists of approximately 217.1 acres of land that is presently being developed into a subdivision, Easton Club East.[4] At the time of the annexation in 1993, portions of the Lyons Farm were situated in the electric service territories of two electric companies: the Easton Utilities Commission ("Easton"), which is petitioner's

---

3. Section 7–210(d) of the Public Utility Companies Article provides:

"(d) *Authority to supply electricity within annexed area.*—If the boundaries of a municipal corporation are enlarged by annexation, the municipal corporation may acquire the exclusive right to supply electricity within the annexed area if:

(1) the municipal corporation:

(i) files a petition with the Commission seeking approval to acquire the exclusive right to supply electricity within the annexed area;

(ii) provides a copy of the petition to each electric company whose service territory or electric plant will be affected by the annexation; and

(iii) attaches to the petition a copy of the amendment to the municipal corporation charter the describes the area annexed and a description of the service territory, plant, equipment, and customers of each electric company that is likely to be affected by the annexation; and

(2) the Commission determines that modification of the service territory of an electric company and the transfer of a franchise or right under the franchise is in the public interest."

4. When fully developed, Easton Club East will contain approximately four hundred homes, with the streets, alleys and roadways to be owned, controlled and maintained by petitioner.

The actual development of the Lyons Farm did not begin until the summer of 2001. There is no evidence in the record that Easton had any interest in providing service to the annexed area from 1993 until 2001, *i.e.,* until it appeared that the stage of development had progressed to the point where the providing of service might be profitable. Up until that point Easton was apparently content with having Choptank provide service and during that period had no problems with the fact that Choptank was utilizing areas within the municipality to provide such services.

municipal electric utility, and Choptank.[5] In a 1966 Order (Order No. 56203 in Case No. 6017) ("1966 Order"), the Commission demarked the service territories of the various electric companies, including Choptank and petitioner. Of the more than 200 acres annexed by petitioner in 1993, only a small amount of the area, approximately 10%, was, pursuant to the 1966 Order, located within petitioner's electric service territory boundaries with the remainder, and majority, being located, and serviced, by Choptank.

In its 2001 petition to the Commission, petitioner asserted that granting Easton the exclusive right to supply electricity to all of the annexed area would serve the public interest in the following ways: 1) future ECE subscribers would pay the same rates as other residents of the Town; 2) Easton's rates for electric service are now and have been historically lower than Choptank rates; 3) ECE residents would receive a consolidated statement of all utility usage, including electricity, natural gas, water and sewerage services; 4) the Easton service center is located 2.5 miles from ECE, while the Choptank service center is located 18.5 miles away; 5) ECE residents would be spared the confusion of having neighbors who receive a different service; 6) Easton owns and maintains

---

5. Choptank originally derived its authorization to service the disputed area in 1940, when the Board of County Commissioners of Talbot County granted Choptank:

"permission to erect, operate and maintain ... in perpetuity ... [facilities] for the purpose of transmitting and distributing electrical energy ... on, along, over and across the county roads and highways, streets, lanes, alleys and properties within Talbot County, including those in, or in the vicinities of, any towns or villages incorporated or unincorporated."

In addition to its franchise from Talbot County, Choptank also has authority from the Commission to provide electric service within that portion of its service area annexed by petitioner. First, in 1941, the Commission granted Choptank's request to exercise "the franchises granted to it by resolutions of the County Commissioners of Queen Anne's, Talbot, and Somerset counties...." *Application of Choptank Cooperative, Inc.,* 32 Md. PSC 49 (1941). Second, when the Commission designated the service territories of all electric companies within the State in its 1966 Order, the area in question was included in the service area of Choptank. *Establishment of Service Areas of Electric Utilities Within Maryland,* 57 Md. PSC 59 (1966).

generators in Easton, while Choptank has only partial ownership in two generators in Virginia; and 7) Easton can extend its distribution system to ECE more economically than Choptank.

As noted above, petitioner filed this petition with the Commission on March 5, 2001. On January 18, 2002, a Proposed Order of Hearing Examiner ("Proposed Order") was issued. In the Proposed Order, the Hearing Examiner analyzed the Commission's practices with respect to electric service area disputes. The Hearing Examiner found that before an electric service territory boundary established by the Commission in the 1966 Order could be modified, the Commission must first find that the modifications are "in the 'public interest' which requires strong and clear evidence of the need, equity and practicality of the proposed changes." The Hearing Examiner found that petitioner did not provide adequate evidence that such a change would be in the public interest and, thus, by the Proposed Order, recommended denial of petitioner's request.

On February 11, 2002, petitioner noted an "appeal" from the Proposed Order. At the Commission level, petitioner raised two issues: 1) whether Choptank lacks the legal authority to install and maintain electric facilities within petitioner's corporate limits; and 2) whether maintenance of the existing boundary between Easton and Choptank is contrary to the public interest. The Commission, after considering the arguments of the parties and the record evidence, adopted the Proposed Order.

Petitioner filed a Petition for Judicial Review in the Circuit Court for Talbot County on May 28, 2002. By a judgment dated January 14, 2003, Judge Horne, sitting for the Circuit Court for Talbot County, affirmed the Commission's Order. Thereafter, on January 30, 2003, petitioner noted its appeal of the Circuit Court's judgment to the Court of Special Appeals. On June 19, 2003, prior to consideration by the Court of Special Appeals, we issued a Writ of Certiorari.

## II. Standard of Review

Md.Code (1998), § 3–203 of the Public Utility Companies Article sets forth the limited "scope of review" by this Court over decisions by the Public Service Commission. It states that:

"Every final decision, order, or regulation by the Commission shall be prima facie correct and shall be affirmed unless clearly shown to be:

(1) unconstitutional;

(2) outside the statutory authority or jurisdiction of the Commission;

(3) made on unlawful procedure;

(4) arbitrary or capricious;

(5) affected by other error of law; or

(6) if the subject of review is an order entered in a contested proceeding after a hearing, the order is unsupported by substantial evidence on the record considered as a whole."

In addition, while this Court has made clear that a decision of the Commission is subject to judicial review, it will not be disturbed on the basis of a factual question except upon clear and satisfactory evidence that it was unlawful and unreasonable. *See Baltimore Gas & Elec. Co. v. Public Serv. Comm'n,* 305 Md. 145, 161–62, 501 A.2d 1307, 1315 (1986); *Public Serv. Comm'n v. Baltimore Gas & Elec. Co.,* 273 Md. 357, 361–62, 329 A.2d 691, 694 (1974); *Public Serv. Comm'n v. Baltimore Transit Co.,* 207 Md. 524, 531, 114 A.2d 834, 836–37 (1955); *Mayor and Council of Crisfield v. Public Serv. Comm'n,* 183 Md. 179, 185–87, 36 A.2d 705, 708–09 (1944); *Public Service Comm'n v. Byron,* 153 Md. 464, 479, 138 A. 404, 410 (1927). Such a decision is accorded the respect due an informed agency that is aided by a competent and experienced staff. *Potomac Edison Co. v. Public Serv. Comm'n,* 279 Md. 573, 582–83, 369 A.2d 1035, 1041 (1977) (citing *Balto. Trans. Co. v. Pub. Ser. Comm.,* 206 Md. 533, 558, 112 A.2d 687, 698 (1955)). Questions of law, however, are "completely subject to review by the courts." *Cambridge v. Eastern Shore*

*Public Serv. Co.*, 192 Md. 333, 339, 64 A.2d 151, 154 (1949)(citing *Mayor & Council of Crisfield v. Public Serv. Comm'n*, 183 Md. at 189, 36 A.2d at 710). This is consistent with the standard of review applicable to administrative agencies generally. *Ramsay, Scarlett & Co. v. Comptroller*, 302 Md. 825, 836–37, 490 A.2d 1296, 1300–02 (1985). *See also Liberty Nursing Center, Inc. v. Department of Health and Mental Hygiene*, 330 Md. 433, 443, 624 A.2d 941, 946 (1993); *Caucus Distrib., Inc. v. Maryland Securities Comm'r*, 320 Md. 313, 324, 577 A.2d 783, 788 (1990); *Maryland State Police v. Lindsey*, 318 Md. 325, 334, 568 A.2d 29, 33 (1990); *State Election Bd. v. Billhimer*, 314 Md. 46, 58, 548 A.2d 819, 825 (1988); *Washington Nat'l Arena v. Comptroller*, 308 Md. 370, 378–79, 519 A.2d 1277, 1281–82 (1987).

### III. Discussion

Before we delve into the specifics of the case before us, it would perhaps be of some service to delineate the process by which electric service providers, such as Choptank, are granted the right to provide electric service to designated areas. In Maryland, a public service company cannot operate within the state absent 1) a franchise,[6] and 2) the Commis-

---

**6.** The concept of a utility franchise was discussed by the Court of Special Appeals in *Baltimore Steam Co. v. Baltimore Gas & Elec. Co.*, 123 Md.App. 1, 716 A.2d 1042, *cert. granted*, 351 Md. 661, 719 A.2d 1261 (1998), *vacated as moot*, 353 Md. 142, 725 A.2d 549 (1999):

"The term 'franchise' ... [we] address [is] the type of franchise most commonly associated with a utility company's right to dig up the public streets in the course of providing its particular service.... [P]ermanent encroachments on public property for private use would, in the absence of authorization, constitute a public nuisance and a trespass against the governing authority. Although a municipality can authorize minor encroachments in any number of ways (by license, permit, or perhaps even acquiescence), a utility company will generally require the type of ongoing and widespread authorization that only a franchise can provide."

*Baltimore Steam*, 123 Md.App. at 20, 716 A.2d at 1051–52 (citations omitted).

The term "franchise" is often used generally to indicate the territorial rights established by a state regulatory entity, although strictly speaking, the franchise is granted by local governments in respect to the grant of rights to utilize public streets, etc. It has become customary to

sion's authorization to operate or exercise that franchise. As this Court has stated, "a franchise may be granted either directly by the Legislature or by a municipal corporation, provided the latter is clothed with the power, but it must emanate from the State." *Water Co. v. Baltimore County,* 105 Md. 154, 162, 66 A. 34, 37 (1907). *See also Cambridge v. Eastern Shore Pub. Serv. Co.,* 192 Md. 333, 64 A.2d 151 (1949). The Commission itself, therefore, does not have the authority to grant such a franchise. *See Cambridge,* 192 Md. at 339, 64 A.2d 151.

 While the Commission cannot grant a franchise to use the streets in Easton, its authority to designate the areas in which the service rights may be exercised gives it an important role in that process and further enables it to assure the efficient and non-duplicative provision of utility service in geographic areas where more than one electric utility claims a franchise.[7] Of special importance to the case before us, the Commission has the sole authority to authorize the areas in which a public utility may provide service and the power to transfer such rights following an annexation—provided it finds that such a transfer is in the "public interest." *See* Md.Code (1998), §§ 5–201(a) & 7–210(d) of the Public Utility Companies Article. It is with these principles in mind that we turn to petitioner's first question: whether Choptank can continue to

refer to the granting of both types of rights as franchises. We shall use that term in both ways in our discussion, with context providing distinctions as necessary.

7. In a 1966 Order by the Public Service Commission (Order No. 56203 entered in Case No. 6017), the Commission demarked the service territories of the various electric companies in the state, including those related to Choptank and the area known as Lyons Farm. In this Order, the Commission made the specific finding that:

"designation of service areas for electric utilities are in the public interest because such designation would eliminate future wasteful construction of duplicate distribution facilities, it would permit electric utilities to develop unserved portions of their service areas in the most economical manner, and it would reduce to a minimum disagreements between companies as to service areas."

provide electrical service, without petitioner's consent, to the 217.1 acres that have been annexed by petitioner.

As noted above, § 7–210(d) of the Public Utility Companies Article specifically deals with the authority to supply electricity within an annexed area and, therefore, is directly on point in this case. The statute, as relevant here, states that:

"(d) *Authority to supply electricity within annexed area.*— If the boundaries of a municipal corporation are enlarged by annexation, the municipal corporation may acquire the exclusive right to supply electricity within the annexed area if:

(1) the municipal corporation:

(i) files a petition with the Commission seeking approval to acquire the exclusive right to supply electricity within the annexed area;

(ii) provides a copy of the petition to each electric company whose service territory or electric plant will be affected by the annexation; and

(iii) attaches to the petition a copy of the amendment to the municipal corporation charter that describes the area annexed and a description of the service territory, plant, equipment, and customers of each electric company that is likely to be affected by the annexation; and

(2) the Commission determines that modification of the service territory of an electric company and the transfer of a franchise or right under the franchise is in the public interest."

On March 5, 2001, petitioner began the process under § 7–102(d) by filing its petition with the Commission. The Commission, however, after examining the findings of the Hearing Examiner, did not find that a transfer of electrical service rights from Choptank to petitioner was in the public interest, as is required by § 7–102(d)(2). We cannot say that such a finding was erroneous under the limited standard of review provided by § 3–203 of the Public Utility Companies Article.

Of particular relevance to the case before this Court is the decision by the Court of Special Appeals in *Mayor & Council of Berlin v. Delmarva Power & Light Co.*, 95 Md.App. 585, 622 A.2d 763, *cert. denied,* 331 Md. 480, 628 A.2d 1067 (1993) (*"Delmarva Power"*). In that case, the Town of Berlin sought to supply electricity to an area of approximately 60 acres that it had annexed, and it filed a petition for an order modifying Delmarva Power's service area to the 60 acres as established in 1966 by the Public Service Commission. The petition was denied by the Commission, but the Town of Berlin decided to supply electricity to the area anyway, and Delmarva Power filed a complaint to confirm its exclusive right to provide service to the area. The intermediate appellate court held that Delmarva Power had a perpetual and exclusive state franchise [8] to serve the area in question, and the 1966 Order authorized Delmarva Power to serve the area by exercising its franchise. Furthermore, the intermediate appellate court held that Delmarva Power did not need the town's consent to provide service to the area, and the town had no right or authority on its own to extend electrical service to that area. The Town of Berlin's utility entity had a limited right, *but its exercise was limited by the authority of the Commission.*

 Petitioner's contention, much like that of the Town of Berlin in *Delmarva Power,* appears to be that a legally operating utility's authority to provide electrical services to an area is automatically negated by an act of municipal annexation. This simply is not the case:

"[T]he general rule seems to be that if a company is granted a franchise in certain territory that is afterwards annexed to another municipality, the franchise does not extend beyond the old limits of the territory annexed. *However, the right conferred to exercise the franchise within the limits of the*

---

**8.** Delmarva Power had been granted a franchise directly by the State by way of specific 1909 charters to its predecessors, The Electric and Ice Manufacturing Company and The Crisfield Ice Manufacturing Company, to serve that area in Berlin. Petitioner attempts to utilize that fact to distinguish that case from the case *sub judice.* That is a distinction that makes no difference in the context of this case.

*territory annexed is not annulled thereby. If the annexed area is being served by a private utility, the utility owned by the annexing city has no right to invade such area.* In addition, upon expansion of city limits, the franchise of a utility serving the annexed city has been held not to supersede the franchise of the utility that had serviced the annexed area before it came within the city limits."

12 Eugene McQuillin, The Law of Municipal Corporations § 34.71 (3d ed.1995) (emphasis added) (footnotes omitted). *See, e.g., Delta Elec. Power Ass'n v. Mississippi Power & Light Co.,* 250 Miss. 482, 149 So.2d 504, *cert. denied,* 375 U.S. 77, 84 S.Ct. 196, 11 L.Ed.2d 142 (1963); *Town of Culpeper v. Virginia Elec. and Power Co.,* 215 Va. 189, 207 S.E.2d 864 (1974) (both cases holding that municipal annexation cannot affect a rural electric association's right to serve current and future members within the utilities' certified areas).

To adhere to petitioner's theory would be to completely ignore the statute enacted by the Maryland Legislature to cover the specific situation in the case at bar; § 7–210(d) of the Public Utility Companies Article. As appropriately noted by Judge Horne, if petitioner were correct, "annexation would allow Petitioner and other municipalities to undo [the Commission's] service territory designations at will, circumventing . . . § 7–210(d) and thwarting [the Commission's] stated policy for establishing stable electric service territories in the first place." In *Delmarva Power,* the Court of Special Appeals stated that when municipalities are granted limited franchises to provide electric service by the Legislature, "the exercise of that franchise, like the exercise of any public service company's franchise, is subject to the jurisdiction and authority of the PSC." *Delmarva Power,* 95 Md.App. at 591, 622 A.2d at 766. We agree. Petitioner's power to provide electrical service to annexed areas is subject and subordinate to the Commission's power to designate the provider of service.

The language of § 7–210(d) makes it clear that the General Assembly intended that, before the existing service area of an electric company can be modified and before there can be a "transfer of a franchise or a right under the franchise" due to

annexation, the Commission must determine that the transfer is in the "public interest." Petitioner cannot oust Choptank, operating under a lawful, pre-existing franchise and territorial designation, by way of an annexation unless the Commission determines that modification of the existing franchise is in the "public interest." This "public interest" analysis is based in part on the need, equity, and practicality of the proposed modification in respect to providers. Here, the Commission did not find that petitioner's desire to service the annexed area was in the "public interest." [9]

As stated earlier, we shall not overturn a factual decision by the Public Service Commission unless it proves to be unlawful or unreasonable. *See Office of People's Council v. Public Serv. Comm'n,* 355 Md. 1, 14, 733 A.2d 996, 1003 (1999); *Baltimore Gas & Elec. Co. v. Public Serv. Comm'n,* 305 Md. 145, 161–62, 501 A.2d 1307, 1315 (1986); *Mayor and Council of Crisfield v. Public Serv. Comm'n,* 183 Md. 179, 185–87, 36 A.2d 705, 708–09 (1944). Therefore, this Court's review is generally limited to whether a reasonable mind could have reached the same conclusion, *i.e.,* that a change in electrical service territories was not in the "public interest"—the interests of the public generally and not just the interests of the ECE residents. In its acceptance of the Hearing Examiner's finding that Choptank should continue to provide service to the annexed area, the Commission adopted the Hearing Examiner's findings that Choptank demonstrated that it is capable of providing service to the entire Lyons Farm subdivision and therefore there is no need for petitioner to take over as provider. As petitioner has not shown by clear and satisfactory evidence that the Commission's decision was unreasonable

---

9. In particular, at the pre-hearing conference, the Hearing Examiner decided that the Commission's analysis in the case of *In Re Mayor and Council of Federalsburg, Maryland,* 68 Md. PSC 501 (1977) ("*Federalsburg*") would be used to determine whether the proposed change in service territory would meet the "public interest" standard in § 7–210(d). In *Federalsburg,* the Commission found that a service territory change is in the public interest when "strong and clear evidence [shows] the need [for], equity [of], and practicality of the proposed change." *Federalsburg,* 68 Md. PSC at 504.

or unlawful, we hold that the Commission did not err in its decision that a transfer of electrical service rights from Choptank to petitioner was not in the "public interest" as intended under § 7–210(d)(2) of the Public Utility Companies Article. *See Public Serv. Comm'n v. Delmarva Power & Light Co.,* 42 Md.App. 492, 400 A.2d 1147, *cert. denied,* 286 Md. 746 (1979).

In regard to petitioner's argument that Choptank cannot continue service in the annexed area without petitioner's "consent," which petitioner may refuse to grant, we hold that petitioner is not in the position to dictate where Choptank can provide its service within the annexed land area; that is exclusively the domain of the Commission. *See* Md.Code (1998), § 5–201 of the Public Utility Companies Article. It was made clear in *Delmarva Power* that the electric service provider did "not need the Town's consent to provide service in the disputed area. . . ." *Delmarva Power,* 95 Md.App. at 590, 622 A.2d at 766. As such, whether or not petitioner "consents" to Choptank providing electric services to the annexed area has no bearing on this Court's decision. It is *only* the determination, *i.e.,* "consent" of the Commission, by granting a modification of electric service territories through the process of § 7–210(d) of the Public Utility Companies Article, that has any weight in such matters.

In *Delmarva Power,* Berlin argued that it received rights via its annexation that, in effect, repealed the franchise or territorial designation granted to Delmarva Power by the State. Here, petitioner argues that its annexation, in effect, repeals the franchise previously granted to Choptank by Talbot County and the territorial designation by the Commission. As in *Delmarva Power,* in the present case Choptank does not need petitioner's permission to provide service and petitioner cannot unreasonably withhold consent for Choptank to utilize its public ways to provide that service.

In the latter respect, petitioner argues that, under both the Electric Cooperative Act, Chapter 179 of the Laws of Maryland of 1976 ("Co-op Act") and § 7–103 of the Public Utility Companies Article, its consent is required in order for

Choptank to install additional electric lines into the area that has been annexed. With respect to the Co-op Act, Section 4(j) authorizes electric cooperatives:

"[t]o construct, maintain and operate electric transmission and distribution lines along, upon, under and across publicly owned lands and public thoroughfares, including, without limitation, all roads, highways, streets, alleys, bridges and causeways, after first securing the proper assent of the municipal authorities of the city or town, or of the county commissioners or county council of the county in which such electric lines are proposed to be constructed, under such reasonable and proper regulations and conditions as may be prescribed in such assent."

Similarly, § 7–103 states that:

"(a) *Manufacture, sell, and furnish light and power.*—An electric company incorporated in Maryland may:

(1) manufacture, sell, and furnish electric power in any municipal corporation or county of the State;

(2) construct a power line to transmit power under, along, on, or over the roadways or public ways of any municipal corporation or county of the State; and

(3) connect the power line from the place of supply to any other structure or object.

(b) *Laying of power lines—Consent of local government required.*—(1) An electric company must have the consent of the governing body of the municipal corporation *or* county before laying or constructing any power line in accordance with subsection (a) of this section.

(2) The governing body of the municipal corporation or county may adopt reasonable regulations and conditions for the laying of a power line, including regulations requiring the electric company to refill and repave any roadway or public way under which the power line is laid." (Emphasis added).

■■■ Petitioner contends that the language above makes the right of Choptank to continue to provide service to the annexed area contingent upon petitioner's assent. A closer

inspection of the language reveals that this reading is erroneous. The territorial rights granted are determined as of the time of the original grant. In other words, the "or" refers to the governing entity in control of the service area at the relevant point in time, *i.e.*, when the service rights are first granted by the Commission. The Co-op Act authorizes an electrical cooperative to operate in a given area once it has received the assent of the municipal authorities *or* the county authorities, whichever is in control at the relevant time, and to continue that service until, and if, that right is transferred by the Commission pursuant to the provisions of § 7–210(d) of the Public Utility Companies Article. Likewise, § 7–103(b) also uses similar "municipal corporation *or* county" language. In other words, absent a statute to the contrary, municipal corporations during annexations, in respect to the provision of electric services, annex subject to the existing franchises and territorial designations, unless the Commission finds that it is in the "public interest" to change the territorial designations.

Therefore, the obvious response to petitioner's argument is that Choptank has not sought a franchise from petitioner to construct, maintain, and operate electrical lines within the Lyons Farm area because it received a franchise from Talbot County to serve this area in 1940, and it has been doing so since that time. The position taken by petitioner would serve to revoke the rights previously granted by the governing entity, the county, that then had the power to grant such rights. In the case of *Town of Culpeper v. Virginia Elec. & Power Co.*, 215 Va. 189, 207 S.E.2d 864 (1974), the Supreme Court of Virginia, faced with facts similar to the ones before us,[10] stated that:

---

10. In *Culpeper,* the Town of Culpeper had annexed an area that the utilities had been serving for approximately twenty years. The Town of Culpeper claimed that, upon its annexation, the territory became subject to the jurisdiction and control of the town. The Town partly based its argument on the language of Article VII, Section 8 of the Constitution of Virginia, which provided, in part, that "No ... electric light or power ... company [or] ... association ... shall be permitted to use the streets, alleys, or public grounds of a city or town without the previous consent of the corporate authorities of such city or town."

"Admittedly, where a utility proposes to enter an incorporated town and intends to install its facilities therein, the utility must first obtain the consent of the municipality. However, we are not dealing here with a utility that seeks original entry into a town, but with franchised companies which have been serving the area involved for approximately twenty years prior to its being annexed by the town.

\* \* \*

"We think it clear that the intention of the framers of the constitutional provision in question [requiring consent] was to prohibit a utility from *entering* the town without prior consent. The intent was not to require the ouster of a utility and its facilities from an area where such facilities were already franchised and lawfully in existence and the utility was operating therein prior to such area becoming a part of a town."

*Culpeper*, 215 Va. at 191–94, 207 S.E.2d at 866–68 (alteration added). We agree with the analysis of the Virginia Supreme Court in *Culpeper* concerning its own "consent" provisions; the intention of neither the Co-op Act nor § 7–103 was to prevent a utility such as Choptank from continuing its service of an area annexed by a municipality.

While it may be true that Choptank will not be given free reign over the placement of new electrical lines within the annexed area, it is also true that petitioner may not unreasonably withhold its consent from Choptank, believing itself to be impervious to scrutiny under § 7–103(b). The very nature of the franchise that has been granted to Choptank confers upon it the right to use the public streets (whether in a municipality or otherwise) in the course of providing its electrical service. The municipality may, of course, impose reasonable conditions. It would be difficult to conceive of a utility company serving individual households without the right to make some use of

---

The Supreme Court of Virginia held that Va. Const. art. VII, § 8 could not be retroactively applied to the utilities that had been providing service to the area before annexation. Therefore, the Town of Culpeper could not legally oust the lawfully existing franchises.

the public streets or other public property in order to transmit its product to its customers, whether this is accomplished by hanging wires from poles, laying cables in the ground, or running pipes along a road. To hold otherwise would allow for all municipalities to dictate who services an annexed area. It would permit petitioner to improperly usurp the functions of the Public Service Commission. That it cannot do. Under § 7–103(b)(2), however, petitioner, as we have said, "may adopt reasonable regulations and conditions for the laying of a power line," and these regulations, if reasonable, must be complied with by Choptank.

Petitioner next asks this Court to decide whether the Commission's decision in maintaining Choptank's service area in relation to the annexed land wrongfully deprived the residents of ECE of a right to receive their electrical service from petitioner. We hold that it does not. Petitioner claims that by not allowing all residents of ECE to have their electrical service provided to them by petitioner, the residents of ECE are being unfairly discriminated against in violation of the Fourteenth Amendment to the United States Constitution and Article 24 of Maryland's Declaration of Rights.[11] Even if petitioner has standing to raise such a claim on behalf of private persons who are not parties to this proceeding, we do not find this claim to be persuasive.

The Commission is charged with ensuring that all of the residents in this State, including the residents of Easton, receive adequate and reliable electric service at just and reasonable rates. *See* Md.Code (1998), § 2–113 of the Public Utility Companies Article. No two electric utilities have the same rates or costs of service. Simply because the rates

---

11. The Fourteenth Amendment provides in pertinent part: "... No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. While the Maryland Constitution contains no express Equal Protection Clause, this Court has deemed "it settled that this concept of equal treatment is embodied in the due process requirement of Article 24 of the Declaration of Rights." *Attorney General v. Waldron,* 289 Md. 683, 704, 426 A.2d 929, 940–41 (1981).

between Choptank and petitioner may vary by a negligible amount does not mean that the rates charged by Choptank are either unjust or unreasonable. It would be contrary to the law for this Court to hold that a resident in one service territory is being denied equal protection of the law merely because a resident in a different service territory, with a different cost of service, is paying a lower rate. The Commission determines what is in the best interest of the public as a whole, i.e., all residents of the State, not just those residents of ECE. The General Assembly has ensured, via the Commission, that each and every consumer in this State will have access to adequate, reliable electricity at a just and reasonable rate, without *unjust* discrimination. *See* Md.Code (1998), §§ 2–113 & 4–102 of the Public Utility Companies Article.

Petitioner continues its constitutional argument by arguing that "no rational basis" can support the Commission's decision to allocate utility service among ECE residents between Choptank and petitioner. Even if the issue is appropriate for us to address in the present context of this case, because we would not view the future residents of ECE as belonging to an inherently suspect class, the Commission's decision to maintain the *status quo* of the electric service territories in ECE would only need to pass, as petitioner correctly suggests, the "rational-basis" test, *i.e.,* whether "the classification challenged be rationally related to a legitimate state interest." *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511, 517 (1976). We must therefore look to the reasoning behind the Commission's decision.

In finding that the electric service territories established by the 1966 Order continued to serve the public interest, the Commission observed:

"In this proceeding, [petitioner] has not shown that there is a need to displace Choptank as the electricity provider in the Lyons Farm subdivision because the record demonstrates that Choptank can and will provide reliable service. In terms of equity, [petitioner's] assertions are not sup-

ported by the record. Finally, as a practical matter, Choptank is ready, willing, and able to serve the Lyons Farm subdivision, and in fact is doing so today." (2002 Public Service Commission Order at 21) (alterations added).

As did Judge Horne, we find that providing reliable electric service to the public is clearly a legitimate state interest and that the Commission's decision to maintain the pre-existing electrical service territories of petitioner and Choptank is rationally related to that interest. Stable electric service territories encourage electricity providers to invest in their infrastructure. Were the service territories unstable, the service providers would have little incentive to improve infrastructure they may lose in the future. Improvements in electrical infrastructure increase both the safety and the reliability of the electrical distribution system throughout Maryland. These purposes are not only unquestionably legitimate, they are the very core of the Commission's statutory duties. *See* Md.Code (1998), § 2–113 of the Public Utility Companies Article.

Lastly, despite petitioner's claims to the contrary, the right for residents of ECE to receive their electric service from petitioner, or any specific provider, is not a fundamental personal right. Tellingly, petitioner cites no relevant legal authority to support such a position. The fact that numerous Maryland municipalities are served by more than one electric service provider further weakens petitioner's contention.

## IV. Conclusion

We hold that petitioner's 1993 action of annexing an area in Talbot County, to which a majority of that area Choptank Electrical Cooperative, Inc. provides electrical service, does not automatically abrogate Choptank's franchise that was lawfully granted to Choptank by Talbot County in 1940 and territorially delineated by the Commission in a 1966 Order. Petitioner has no right to extend its electrical service area beyond that allocated to it by the Commission without the Commission's approval. We find no compelling reason to find that the Commission's decision regarding the territorial ser-

vice areas of the annexed land was erroneous under our limited standard of review as stated by § 3–203 of the Public Utility Companies Article. Because the Commission did not find that a modification of the existing territorial service areas was in the "public interest," as is required under § 7–210(d) of the Public Utility Companies Article, Choptank shall retain its present territorial service area within the 217.1 acres of annexed land.

We also hold that the Commission's decision to maintain the historical territorial electrical service boundaries established in its 1966 Order does not violate ECE residents' Equal Protection rights, nor does there exist any fundamental personal right for ECE residents to receive electrical service exclusively from petitioner or from any specific provider for that matter. Choptank has lawfully been granted the right to serve a majority of the annexed area, and this includes the right to provide electrical service to those ECE residents who reside within Choptank's service area boundaries. Choptank is their electrical service provider.

**JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY AFFIRMED; COSTS TO BE PAID BY PETITIONER.**