## PUBLIC UTILITIES

COUNTIES – CHARTER HOME RULE COUNTIES – WHETHER MONTGOMERY COUNTY HAS AUTHORITY TO CREATE A PUBLICLY CONTROLLED ELECTRIC COMPANY

December 5, 2011

*Valerie Ervin, President*
*Montgomery County Council*

You have asked whether Montgomery County ("County") has authority to create a publicly controlled electric company to distribute electricity to County customers in place of Potomac Electric Power Company ("PEPCO").

In compliance with our policy on opinion requests from local governments, you provided the County Attorney's opinion on various legal issues raised by your question. The County Attorney concluded that the County could not assign such a function to a County agency but would need to create a new entity under the State corporation law to distribute electricity; that such an entity might hold a franchise to distribute electricity, but could not exercise that franchise without the approval of the Public Service Commission ("PSC"); that the entity would have to obtain the consent of a municipality to lay or construct power lines in the municipality; and that neither the entity nor the County could condemn the infrastructure of an operating utility like PEPCO without the General Assembly's express authorization to do so. A copy of that opinion is attached.

We concur with the County Attorney's description of the legal prerequisites to the displacement of PEPCO by a County-controlled distributor of electricity. We elaborate only on the PSC approval process.

As the County Attorney indicated, a new entity would have to apply to the PSC for the right to exercise a franchise to distribute electricity to County customers. That process would concern not only the new entity's ability to serve the County's citizens, but also

the modification of PEPCO's service territory.[1] PEPCO's existing service territory in Maryland also extends to Prince George's County and Howard County.[2] The PSC has explained that "electric service boundaries should not be changed without strong clear evidence of need, equity, and practicality of the proposed change." *In re Choptank Electric Cooperative and St. Michaels Utilities Commission*, PSC Case No. 9071, Order No. 81068, 2006 PSC LEXIS 23.[3] We understand that the County has raised the prospect of modifying PEPCO's service territory in a pending proceeding before the PSC. *See In re Investigation into the Reliability and Quality of the Electric Distribution Service of Potomac Electric*

---

[1] As a practical matter, the success of such an application would likely depend at the outset on the new entity's ability to acquire PEPCO's distribution infrastructure by condemnation. *See Town of Easton v. Public Service Commission*, 379 Md. 21, 33, 838 A. 2d 1225 (2003) (PSC's authority to designate where a company may exercise its franchise "enables it to assure the efficient and non-duplicative provision of service"). We agree with the County Attorney that the current law does not empower a new public service entity to condemn another public service company's real property interests and other components of its infrastructure for the purpose of providing the same services. Given the extensive State regulation of electric companies and the cross-jurisdictional nature of PEPCO's service territory, the delegation of such a power would be a matter for a State law, not a local ordinance. For a discussion of various legal issues raised by a local government's attempt to take over the operations of a public utility, *see* S.R. Saxer, *Government Power Unleashed: Using Eminent Domain to Acquire a Public Utility or Other Ongoing Enterprise*, 38 Ind. L. Rev. 55 (2005).

[2] PEPCO also provides service in Washington, D.C.

[3] Choptank illustrates the difficulty of proving those three propositions. In that case, the PSC found the petitioner's proof insufficient and declined to divide the service territory in question. First, the PSC found that "practicality cuts against carving up the [existing] service territory" because that change would "leave uncertain the future" of the territory left to the partially-ousted utility. 2006 PSC LEXIS at *54-55. Second, it found "no paramount or preeminent 'need' to serve [the existing territory]; that is, there is no service problem in either of the areas that would be fixed by awarding the territory to [the applicant]," *Id.* at *56-57. Finally, the PSC found that the petition was not "advanced by equity considerations," because, "[e]ven assuming that fair value would be exchanged for the property being acquired," the applicant had "offered no particular claim that a failure to grant its petition would be inequitable. . . ." *Id.* at *57.

*Power Company*, Case #9240, Order No. 83526.[4]  In any event, the power to condemn PEPCO's infrastructure, or, for that matter, a simple purchase of that infrastructure, would not by itself assure a new entity of PSC approval to modify PEPCO's service territory.

Douglas F. Gansler
*Attorney General*

Ann MacNeille
*Assistant Attorney General*

Robert N. McDonald
*Chief Counsel*
  *Opinions and Advice*

---

**County Opinion Follows**

---

[4] The County has intervened in that proceeding, asserting that [PEPCO] "has ... operat[ed] an unreliable electric system in Maryland since at least 2005," and has asked the PSC to order PEPCO to take certain remedial actions.  Reply Brief of Montgomery County, p. 23.  The County has requested that, if PEPCO does not improve certain reliability statistics within two years of PSC's issuance of an order in the case, the PSC "act ... to initiate a proceeding to modify [PEPCO's] service territory to remove Montgomery County or revoke [PEPCO's] authority to exercise its franchise to serve Montgomery County, so that the County can move toward obtaining highly reliable electric service from a replacement utility." *Id.* at pp. 16-17; *see also* Initial Brief of Montgomery County at p. 30.

OFFICE OF THE COUNTY ATTORNEY



Isiah Leggett
*County Executive*

Marc P. Hansen
*County Attorney*

TO:     Valerie Ervin, President
          County Council

          Roger Berliner, Vice President
          County Council

FROM:   Marc P. Hansen
          County Attorney
DATE:    September 6, 2011

RE:    Public Electric Company – Creation

      The Council has asked what steps Montgomery County would need to take in order to create a publicly controlled electric company to provide electric service to County customers in the place of Potomac Electric Power Company (PEPCO). The specific questions posed are:

- What changes, if any, would be required in state law to allow for our residents to be served by public power?

- What is the role of the Maryland Public Service Commission, if any, in reviewing or approving the transfer of PEPCO's franchise to a public power entity?

- What are the principal legal issues that arise when pursuing public power in the context of taking service over from an incumbent?

- If an eminent domain action were to be required to assume control of the electric distribution system, how would Montgomery County go about determining the value of the assets?

## Short Answer

In order for a publicly owned and controlled electric utility company to provide electric power to the residents of Montgomery County the following steps would need to be taken by the County:

1) Form a non-stock, non-profit corporation[1] to operate an electric company under the Corporations and Associations Article of the Maryland Code;

2) Obtain the consent (*i.e.* a franchise) from the governing bodies of each municipality in the County to lay or construct power lines within the boundaries of the municipality in accordance with the Public Utilities Article of the Maryland Code;[2]

3) Obtain from the General Assembly the authority to acquire PEPCO's infrastructure by condemnation;[3] and

4) Obtain the consent of the Maryland Public Service Commission (PSC) before delivering electric service to County customers.

---

[1] This opinion assumes that the County would elect to create (directly or indirectly) a corporation as the appropriate business form to deliver electric service to County residents. Responding to the Council's questions does not require a determination of whether a different business form, such as a limited liability company, should or could be used—a decision of the form of business organization that a public electric company should take would require further analysis. Under current law, however, the County could not elect to deliver electric service directly through the County Government.  Section 1-101 (h) of the Md. Public Utilities Code Ann, defines an electric company as a "person who physically transmits or distributes electricity in the State to a retail electric customer." The County is not included in the definition of a "person" under § 1-101 (u). The definition of a "person" in a statute does not include the government unless the intent to include the government is made manifest by the legislature. *Unnamed Physician v. Commission on Medical Discipline,* 285 Md. 1, 12-14 (1979).

[2] The consent of the State would need to be obtained to construct power lines in State right of ways. Consent from the governing body of the County would also need to be obtained as well.

[3] This opinion assumes that PEPCO would not voluntarily sell its infrastructure to a newly formed public electric company.

After obtaining the required approvals for a public electric company to provide service to County customers, the County would need to initiate a condemnation action against PEPCO. In this condemnation action, the County would be required to pay PEPCO "just compensation" for its infrastructure. Just compensation is determined by ascertaining the fair market value of the infrastructure being acquired from PEPCO.

Given the novel issues addressed in this opinion, the Council may wish to obtain the opinion of the Attorney General before pursuing this matter any further.

## Discussion

### *Formation of a public electric company.*

An electric company incorporated in Maryland may "furnish electric power in any municipal corporation or county of the State." Md. Public Utilities Code Ann., § 7-103.

Although the Public Utilities Code does not address how an electric company is formed in Maryland, a review of pertinent legislative history reveals that the provisions of the Public Utilities Code were once part of Article 23 of the Maryland Code, and Article 23 did address how an electric company could be formed.

The 1904 Md. Code Ann., Art, 23 § 14 provided that five or more persons may form a "body corporate" for certain purposes, which were set out in enumerated "classes" of corporations in the sections following § 14. Under § 28 a "class 13" corporation could be formed "for the transaction of any business in which electricity over or through wires may be applied to any useful purpose." Through numerous amendments to Article 23 over the intervening 110 years, this provision along with the other classes of corporations were apparently collapsed into Md. Corporations and Associations Code Ann., § 2-101, which now provides that a corporation may be formed for "any lawful purpose."[4]

---

[4] It appears that the General Assembly moved to a more general approach to incorporation beginning with the 1911 Md. Code, Art. 23, § 2, which provided that a corporation may be formed "for any one or more lawful purposes . . . except where special provisions inconsistent herewith are made in this article for particular classes. . . ." As will be seen in the following discussion public utilities were also formed by special enactments of the General Assembly.

The County could, therefore, authorize County officials to form a non-stock, non-profit corporation to act as an electric company under the State's general laws of incorporation. In the alternative, the Council could indirectly "create" an electric company by enacting legislation offering to grant a franchise over County right of ways to construct power lines to any corporation that was formed with a charter and bylaws consistent with the enacted legislation. The County has adopted this indirect approach with respect to the creation of the Arts and Humanities Council and the Collaboration Council.[5]

### *A franchise is necessary to operate an electric company.*

I.      Section 7-103 of the Md. Public Utilities Code grants a franchise to electric companies.

A franchise is a "government-conferred right to engage in a specific business or to exercise corporate powers"[6] that must be obtained through a legislative act. "A franchise may be granted only by the legislature or by a municipal corporation to which that power has been delegated." *Charles County Sanitary District v. Charles Utilities,* 267 Md. 590, 598 (1973). The PSC does not have the authority to grant a franchise. *Id.*

Section 7-103 of the Md. Public Utilities Code grants a franchise to operate an electric company in any municipality or county of the State. But an electric company must obtain the consent of the governing bodies of the municipality and the county in which the electric company will operate before constructing any power lines in the affected jurisdiction.

Subsection (a) of § 7-103 grants a general franchise to operate an electric company in the State; it provides that an electric company incorporated in Maryland may:

> (1)  manufacture, sell, and furnish electric power in any municipal corporation or county of the State;

---

[5] *See* §§ 5A-1 through 5A-7 and 2-117 through 2-122, Montgomery County Code (2004), respectively.

[6] *Black's Law Dictionary* (Abridged Eighth Ed., © 2005, Bryan Garner, ed.).

(2) construct a power line to transmit power under, along, on, or over the roadways or public ways of any municipal corporation or county of the State; and

(3) connect the power line from the place of supply to any other structure or object.

Subsection (b) limits the General Assembly's general grant of authority by requiring the electric company to obtain the consent of the governing bodies of the affected municipalities and counties to "lay or construct" power lines in the jurisdiction; subsection (b) provides:

(1) An electric company must have the consent of the governing body of the municipal corporation or county before laying or constructing any power line in accordance with subsection (a) of this section.

(2) The governing body of the municipal corporation or county may adopt reasonable regulations and conditions for the laying of a power line, including regulations requiring the electric company to refill and repave any roadway or public way under which the power line is laid.[7]

Assuming that operating an electric company would at some point in time require any electric company to "lay or construct" power lines within a municipality, obtaining the consent of the municipalities in the County will be required as a practical matter.[8]

---

[7] The provisions of § 7-103 can be traced back in substantially the same terms to 1910. See 1910 Md. Laws, Ch. 55.

[8] The General Assembly has also granted a general franchise to deliver electricity to an electric cooperative under Md. Corporations and Associations Code Ann., § 5-607. Although the County could authorize County officials to form an electric cooperative, this opinion does not address in detail the powers of an electric cooperative because a cooperative does not provide any significant authority that would not otherwise be available to an electric company formed under § 2-101 of

(continued...)

II.  <u>Montgomery County does not have the power to grant a franchise to an electric company outside of the parameters of § 7-103.</u>

Consideration has been given as to whether the County, as a home rule jurisdiction, has been delegated by the General Assembly the power to grant a franchise to operate an electric company outside the confines of § 7-103.

Montgomery County is a Charter home-rule county organized under Article XI-A of the Maryland Constitution, and it derives most of its powers from the Express Powers Act.[9] The Express Powers Act, however, contains no explicit authority for a charter county to grant a franchise to provide electric power to customers within the county.[10]

Subsection 5(S), however, authorizes the County to enact legislation "deemed expedient in maintaining the . . . welfare of the county." The Court of Appeals has held that this provision should be construed as a broad grant of power to legislate to promote the general welfare of the community. *Montgomery Citizens League v. Greenhalgh,* 253 Md. 151 (1969). This broad power to legislate for the general welfare is circumscribed, however, by the power of the General Assembly to enact general laws and to preempt or reserve fields of legislation as the exclusive preserve of the State. The Court of Appeals has identified several factors to determine whether a field of legislative activity has been preempted by implication.[11]

---

[8] (...continued)
the Md. Corporations and Associations Code Ann. In fact, the voluntary nature of membership in a cooperative could prove problematic in the context of taking over service from PEPCO.

[9] Maryland Code Annotated, Article 25A, Section 5.

[10] Subsection 5(B) authorizes a county to grant "any franchise", but this authority seems to be limited to the context of granting a franchise to use property acquired by the county for public purposes.

[11] The General Assembly, of course, may expressly preempt a field. *See Montgomery County v. Atlantic Guns, Inc.,* 302 Md. 540 (1985). The Md, Public Utilities Code does not contain any language expressly preempting the field of providing electric service to retail customer,

The general rule is that a field, such as the regulation of electric service, has been preempted by implication when the General Assembly has legislated in the field with such comprehensiveness that "the acceptance of the doctrine of preemption by occupation is compelled." *Allied Vending v. City of Bowie,* 332 Md. 279 (1993).[12]  In *Allied Vending,* the Court of Appeals identified certain secondary factors that are to be considered in determining whether preemption exists. The secondary factors include whether: (1) local laws existed prior to the enactment of the State laws governing the same subject matter; and (2) the local law relates to an area over which some local control has traditionally been allowed. *Id.* at 299.

As noted, the Md. Public Utilities Code, § 7-103 provides a general franchise to electric companies to "furnish electric power in any municipal corporation or county of the State." Obtaining a franchise to operate an electric company under the general franchise provisions of § 7-103, or its legislative precursors that stretch back at least 100 years, is not the only means by which a franchise to operate an electric company can be obtained. The General Assembly has granted by special legislation electric franchises to specific corporations. For example, PEPCO acquired its electric franchise from corporations that obtained a franchise from the General Assembly over a century ago.[13]  *See,* 1894 Md. Laws, ch. 540 and 1900 Md. Laws, ch. 245.

The historic practice over the last century of the General Assembly granting, through specific or general enactments, a franchise to operate an electric utility company is well-entrenched, and is a strong indication that the General Assembly has preempted the field of granting electric utility company franchises.

In addition, as noted in *Allied Vending,* the Court of Appeals considers whether local laws existed prior to the enactment of the State laws governing the subject matter in question. Based on the

---

[12] In *Allied Vending,* the Court of Appeals struck down Bowie's regulation of cigarette vending machines concluding that the General Assembly had by implication preempted the field of regulating cigarette vending machines.

[13] PEPCO operates under a franchise granted to Great Falls Power Company. Great Falls received a state wide franchise by acts of the General Assembly in 1894 and 1900. *See Poiomac Electric Power Co v. Birkett,* 217 Md. 476, 479 (1958).

cases reviewed for this opinion, it appears that electric companies obtained their franchises from the General Assembly and there appears to be no persuasive evidence that local governments have exercised any control in this field in the past independent of the franchise processes controlled (general or specific) by the General Assembly.

The only case that mentions the possibility of local control over granting an electric power franchise is *Mayor and Council of Berlin v. Delmarva Power & Light Company,* 95 Md. App. 585 (1993), *cert. denied* 331 Md. 480 (1993). In *Berlin v. Delmarva* a footnote appears indicating that Delmarva obtained a franchise from Worcester County. *Id.,* at 591, n. 2. Worcester County is a commissioner county governed under Article 25 of the State Code. A commissioner county may only exercise those powers specifically granted to it by the General Assembly. Article 25, unlike the Express Powers Act, does not delegate to commissioner counties the power to legislate for the general welfare of the residents of the county. Many of the powers of a commissioner county are granted through the enactment of a public local law. Significantly, Delmarva also operated under a franchise granted by the General Assembly that pre-existed the franchise granted to it by Worcester County. This footnote, therefore, provides little support for the proposition that a county has historically granted a franchise to operate an electric company.[14]

Finally, it is worth noting that the Court of Appeals has applied Dillon's Rule in the context of a local government's authority to grant a franchise. *Purnell v. McLane,* 98 Md. 589 (1904). Dillon's Rule provides that a local government possesses only those powers that are granted to it in express language or those necessarily or fairly implied from that language. Dillon's Rule goes on to provide that "Any fair, reasonable doubt concerning the existence of the power is resolved by the court against the [municipal] corporation and the power is denied." *Id.* at 594. The Court of Appeals went on to note that this rule is applicable in the context of a local government's authority to grant a franchise. The Court stated "The right to a franchise is no more to be presumed,

---

[14] Montgomery County had issued resolutions in 1914, 1927, and 1952 granting PEPCO 25 year franchises. The PSC essentially concluded that these resolutions were superfluous because PEPCO operated under a franchise granted by the General Assembly. PSC Order No. 50070, Case No. 5263 (May 15, 1953).

than the exemption from taxation, and therefore every assertion of such right must, to be efficacious, be distinctly supported by clear and unambiguous enactment. To doubt is to deny the right to the franchise." *Id.* The Court of Appeals cited, with approval, an Ohio case that provided that a franchise "may be granted directly by the State, or by a municipal corporation, if it is clothed with power to make the grant. Such power in the municipality must either be expressly granted, or arise from the terms of the statute by implication so direct and necessary as to be clearly confirmed." *Id.* at 592.

Given the historical practice that electric company franchises have been granted by the General Assembly (and not by local government), and the lack of any express language in the Express Powers Act authorizing charter counties to grant an electric franchise, it is highly probable that the Court of Appeals would conclude that the County does not have the legislative authority to grant an electric public utility franchise independent of the powers granted local government under § 7-103.

### *The Maryland Public Service Commission must approve the transfer of PEPCO's franchise to any new electric company.*

A new electric company would need to obtain the approval of the PSC before exercising an electric utility company franchise. Md. Public Utilities Code, § 5-201, provides, "A public service company[15] may not exercise a franchise granted by law except to the extent authorized by the Commission,"

In *Berlin v. Delmarva Power & Light Company,* the Court of Special Appeals approved the PSC's denial of the Town of Berlin's extension of electric service by the municipal electric company to land annexed by the Town, because the area was already served by Delmarva. The Court approved PSC's finding that "designation of service areas for electric utilities are in the public interest because such designation would eliminate future wasteful construction of duplicate distribution facilities, it would permit public utilities to develop unserved portions of their service areas in the most economical manner, and it would reduce to a minimum disagreements between companies as to service areas." *Berlin v.*

---

[15] A public service company includes an electric company. Md. Public Utilities Code Ann. § 1-101(x).

*Delmarva Power & Light Company,* 95 Md. App. at 592. The PSC has adopted service area maps that confirm the exclusive service areas of the electric utilities in Maryland.[16]

Hence, in order to avoid duplication of infrastructure, the PSC would almost certainly require any entity designated to provide electric service to customers in Montgomery County to acquire PEPCO's infrastructure.

### *Montgomery County must obtain authority from the General Assembly to condemn PEPCO's infrastructure.*

Given the need to avoid creating a duplicate electric distribution system, a publicly controlled electric company would need to obtain PEPCO's distribution infrastructure necessary to serve Montgomery County customers. Assuming that PEPCO would not voluntarily sell its infrastructure to a County created public electric company, PEPCO's infrastructure would need to be acquired through the power of condemnation. Therefore, a newly created electric company would need to be armed with a condemnation power sufficient to acquire by eminent domain the infrastructure of an existing electric company like PEPCO that already possesses the power to condemn for its corporate purposes.[17]

Current State law does not delegate to a newly formed electric company the power to condemn the infrastructure of an existing electric company that enjoys a state-wide franchise as well as the power to condemn for its corporate purposes.[18] Therefore,

---

[16] *See* Order No. 52603, PSC Case No. 6017.

[17] PEPCO's power to condemn for its corporate purposes has been confirmed by the Court of Appeals in *Potomac Electric Power Company v. Birkett,* 217 Md. 476 (1958).

[18] An electric cooperative (see n. 8) may "exercise the power of condemnation in the manner provided by the law of this State for the exercise of that power by other corporations that construct or operate electric transmission and distribution lines or systems." Md. Corporations and Associations Code Ann., § 5-607 (a) (15). But this power is insufficient to empower a cooperative to condemn the infrastructure of an existing electric company absent express authority, because PEPCO's condemnation authority would checkmate a condemnation action by

(continued...)

this opinion examines whether the County's condemnation power would be sufficient to acquire by eminent domain PEPCO's infrastructure on the assumption that the County could delegate to a newly formed public electric company the County's power of condemnation.[19]

Montgomery County has the general power to condemn property for a public purpose. Article 25A, Section 5(B). In order for the County to exercise this general condemnation authority to take property already dedicated to a public use—as is PEPCO's infrastructure—the County must show that its purposed use of the property would not conflict with an existing public use and that the County's purposed use is a more necessary public use.

In 1919, the Court of Appeals concluded that the City of Baltimore did not have the authority to acquire under its general power of condemnation a freight yard operated by Northern Central Railway Company.[20] *Northern Central Railway Company v. Mayor and City Council of Baltimore,* 133 Md. 658 (1919). In turning aside Baltimore City's attempt to acquire by condemnation a freight yard owned by Northern Central Railway, the Court noted, "It is a firmly settled principle of the law of eminent domain that when land has once become lawfully appropriated to a public use [*i.e.,* railway freight yard] it cannot be thereafter condemned for an **inconsistent** user unless authority for such later appropriation has been

---

[18] (...continued)
another electric company. *Nichols on Eminent Domain, §* 2,2[5]. *Cf.* McQuillin, Municipal Corporations, Section 32:79. Section 5-410 of the Public Utilities Code grants the authority to condemn to an electric company formed under Class 13 of Article 23 § 28 of the 1904 Code. This provision would seem to be inapplicable because it is no longer possible to form an electric company under this now repealed provision of State law. Moreover, the condemnation power granted under § 5-410 is no greater than that granted to an electric cooperative.

[19] This assumption, it should be noted, is suspect because the general rule is that apolitical subdivision may not re-delegate it condemnation power to another entity. *Nichols on Eminent Domain, §* 3.211[1]. The Court of Appeals has, however, approved a charter county delegating to its county executive the county's condemnation power, *Anne Arundel County v. Bowen,* 258 Md. 713 (1970).

[20] Railroads, like electric companies, are public utilities.

confirmed expressly or by necessary implication." (Emphasis added) *Id.* at 660.

Relying on *Northern Central Railway Company,* the Attorney General in 1972 concluded that the general condemnation authority of the City of Annapolis and Anne Arundel County was insufficient to condemn easements granted to the Maryland Historical Trust. 57 Op. Atty. Gen. Md. 361 (December 28, 1972).

Although there appears to be no Maryland case directly on point, the general rule is that a local government, under its general condemnation authority, may take property of a private corporation devoted to public use if the property is to be used by the local government for the **same** purpose and in the **same** manner. The rationale for this rule appears to be that the public interest is better served and more generally protected if the use is under the control of local government as opposed to a private corporation. *See,* McQuillin, *Municipal Corporations,* § 32:79.

Despite this general rule, the County would, nevertheless, need to obtain from the General Assembly express authority to condemn PEPCO's electric infrastructure, because the County's condemnation of PEPCO's distribution infrastructure would constitute a *de facto* denial of PEPCO's right to exercise the franchise specifically granted to it (through its predecessors in interest) by the General Assembly.

The Court of Appeals has pointed out on numerous occasions that a local government may not adopt any legislation that prohibits something permitted by the General Assembly. *See, e.g. City of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 391 (1979) and *Forest Heights v. Tillie Frank,* 291 Md. 331, 338 (1981). In *Tillie Frank,* the Court struck down a Forest Heights ordinance that banned fortune tellers in the Town, because Ms. Frank had obtained a license under a Prince George's County law to conduct fortunetelling in the Town. Since the Prince George's County law was superior to a municipal ordinance, the Town's ban could not stand.[21] The County's taking of PEPCO's infrastructure would likely be prevented by the Court under the same rationale

---

[21] Subsequent to the Court's ruling in *Tillie Frank,* the General Assembly enacted legislation providing that certain County laws do not automatically apply within a municipality. *See* Md. Code Ann., art. 23A, § 2B.

used in the *Tillie Frank* case—*i.e.* the County cannot prohibit an activity that the General Assembly has expressly allowed.[22]

### *Method of valuation in condemnation of public utility.*

In exercising its power of condemnation, the newly created electric company would be required to pay PEPCO "just compensation". U.S. Const. amend. V; Md. Const. Art. III, § 40.

Title 12 of the Md. Real Property Code provides guidance in understanding what is meant by "just compensation."[23] The "just compensation" awarded for the taking of property must reflect the fair market value of the property taken, which:

> [I]n a condemnation proceeding is the price as of the valuation date for the highest and best use of the property which a vendor, willing but not obligated to sell, would accept for the property, and which a purchaser, willing but not obligated to buy, would pay, excluding any increment in value proximately caused by the public project for which the property condemned is needed. In addition, fair market value includes any amount by which the price reflects a diminution in value occurring between the effective date of legislative authority for the acquisition of the property and the date of actual taking if the trier of facts finds that the diminution in value was proximately caused by the public project for which the property condemned is needed, or by announcements or acts of the plaintiff or its officials concerning the public project, and was beyond the reasonable control of the property owner.

---

[22] Presumably the County would seek from the General Assembly legislation that empowered an electric company created by the County to condemn property for the public electric company's corporate purposes. This would make it possible for the public electric company to condemn property in jurisdictions within the State in addition to the County. The County's own general power of condemnation probably does not extend beyond its borders. *See* McQuillin *Municipal Corporations,* § 32:76.

[23] Title 12 would not apply directly to PEPCO infrastructure that is not real property, but its principles would be applicable.

Real Prop. § 12-1 0.5(b).

The process would likely begin with a feasibility study to evaluate the costs of the acquisition, financing, and operation of PEPCO's electric distribution system. The preliminary feasibility study should examine the electric load growth, project the costs of service from wholesale power suppliers, and estimate the capital and operating costs of the new electric utility. Among the costs to be considered is the loss of tax revenue that could result from the condemnation of private property for the County utility.[24]

Various methodologies may be used to determine the value of PEPCO's assets, any of which require reports from financial experts. The public electric company may incur severance damages to compensate PEPCO for the reconfiguration of its remaining system to ensure the safety and reliability of service to its remaining customers outside of Montgomery County. The value may include calculation of PEPCO's "stranded costs," which are investments made on behalf of customers to ensure future electric service that are rendered uneconomic when those customers leave the system.

Sales of investor-owned utilities to government entities do not occur frequently, so there may not be comparables upon which to rely in the appraisal process. Valuation methods that have general acceptance include approaches that base the value of the utility on the physical facilities that are being transferred (reproduction cost less depreciation, replacement cost less depreciation) and approaches that determine the value of the system based on the earnings or some other measure of cash flow that the utility will forego as a result of being forced to sell its system. The types of property that will need to be assessed a value include meters, service lines, overhead and underground lines (mains), line transformers (regulators), and substations, as well as the earnings and viability of the company as a going concern. *See WSSC v. Utilities, Inc.,* 365 Md. 1, 27-28 (2001) (discussion of valuation of property in context of WSSC condemnation of an existing water and sewer utility).

---

[24] For tax year 2010, PEPCO paid Montgomery County $517,655.09 in real property taxes. In addition, PEPCO paid Montgomery County $16,175,969.79 in personal property utility taxes.

Suffice it to say that the appraisal of the just compensation due to PEPCO to acquire its property will require complex analysis and calculations. Ultimately, it could require a finding by a jury as to the proper amount to be paid.[25]

I hope that you will find this opinion responsive to your questions. If you have additional questions or concerns, please let me know.

---

[25] The American Public Power Association may be able to share the experiences of other local governments, like Boulder Colorado, that are considering or have taken over private electric companies.